533 F.2d 1361
 Reverend Charles H. NEVETT et al., Individually, and on
behalf of all others similarly situated,
Plaintiffs-Appellees Cross Appellants,
v.
Lawrence G. SIDES, Individually, and in his capacity as
Mayor of Fairfield, Alabama, et al.,
Defendants-Appellants Cross Appellees.
 No. 75-1864.
 United States Court of Appeals,
Fifth Circuit.
 June 8, 1976.
 
 Frank B. Parsons, Fairfield, Ala., Reid B. Barnes, Charles C. Pinckney, Birmingham, Ala., Wm. J. Baxley, Atty. Gen., James S. Ward, Asst. Atty. Gen., Montgomery, Ala., for defendants-appellants cross appellees.
 Wm. M. Dawson, Jr., Edward Still, Birmingham, Ala., for plaintiffs-appellees cross appellants.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before RIVES, GOLDBERG and GEE, Circuit Judges.
 RIVES, Circuit Judge:
 
 
 1
 Three black citizens who presently reside in Fairfield, Alabama, brought this action on behalf of themselves and all other black citizens residing in Fairfield. The defendants are the City of Fairfield, a municipal corporation, the Mayor of Fairfield, the members of the Fairfield City Council, the City Clerk, and the State Attorney General. The plaintiffs charge that, as applied, the state statute which governs municipal elections in Fairfield[1] operates to unconstitutionally dilute voting power.
 
 
 2
 After answers of the defendants, and further refinement of the issues by the pre-trial order, voluminous evidence was introduced. The evidence consisted of documents, testimony from witnesses, and interrogatories and answers thereto by the parties. After each of the two hearings was conducted, the district court dictated into the record the court's findings of fact and conclusions of law.
 
 
 3
 On February 20, 1975, after the conclusion of the first hearing, the district court "Ordered and Adjudged that parties present a plan to the Court, by May 1, 1975, consistent with the Court's directions as dictated in the Court's findings of fact and conclusions of law."
 
 
 4
 Pursuant to that order, six different plans were presented, four by the plaintiffs and two by the defendants. The second hearing was on those plans, and the hearing concluded May 24, 1975. On June 6, 1975, the district court entered its final judgment as follows:
 
 
 5
 It is ORDERED, ADJUDGED and DECREED as follows:
 
 
 6
 1. The defendants' motion for reconsideration of the court's order of February 20, 1975, requiring modification of the existing system of election of members of the City Council of the City of Fairfield, is hereby denied.
 
 
 7
 2. Subject to possible modification under the conditions set forth in paragraph 3 below, the City of Fairfield, Alabama, beginning with the City Council elections of August, 1976, shall institute the following system of selection of a nine-member City Council to replace the system currently in effect pursuant to Title 37, § 426 of the Alabama Code:
 
 
 8
 (a) Eight members of the council shall be elected from single member districts whose boundaries shall follow the outline of districts submitted by the plaintiffs in their plan for eight districts, each member to be elected solely by the voters of his or her respective district.
 
 
 9
 (b) A city council president, having the powers and duties specified by the laws of the State of Alabama, shall be elected at large by the voters of the City of Fairfield.
 
 
 10
 3. In the event there is conducted an official special census of the City of Fairfield, the City Council may within two months after the completion of the special census, but not later than May 1, 1976, request modification of the system of election set forth above, in which event the parties may submit to the court new proposals for the selection of members of the city council from districts apportioned according to the results of the special census.
 
 
 11
 4. There being no just reason for delay, this judgment shall constitute a final judgment in this case, though the court retains jurisdiction of the case for the limited purpose of possible future reconsideration of this judgment under the conditions specified above.
 
 
 12
 5. Costs are hereby taxed against the defendants. Plaintiff's motion for award of attorney's fees is denied.
 
 
 13
 Done this the 6th day of June, 1975.
 
 
 14
 Sam C. Pointer, Jr.
 
 UNITED STATES
 DISTRICT JUDGE
 
 15
 The defendants filed a notice of appeal from each of the orders and judgments; the first entered on February 20, 1975, and the second on June 6, 1975. The plaintiffs moved for reconsideration of the district court's denial of their motion for award of attorney's fees, and on June 20, 1975, the district court refused to reconsider and again denied plaintiffs' motion for attorney's fees. The plaintiffs filed notices of appeal from the order of June 9, 1975, and from the order of June 20, 1975.
 
 
 16
 The relevant fact findings were either intermingled with or preceded Judge Pointer's conclusions of law. None of the findings of fact, considered separately from the intermingled conclusions of law, can be set aside as clearly erroneous. Rule 52(a) F.R.Civ.P. We attach to this opinion the findings of fact and conclusions of law made after the hearing which concluded February 20, 1975, as Appendix A, and those which concluded after the hearing of May 24, 1975, as Appendix B.
 
 
 17
 The appeals and cross appeals of the parties present for this court's disposition the following issues: (1) Did the district court err in deciding that the Fairfield City Council was malapportioned? (2) Did the district court err in rejecting the two plans presented by the defendants or in accepting one of the plans presented by the plaintiffs? (3) Did the district court err in adding one at-large member to the plaintiffs' suggested single-member plan? (4) Did the district court err in refusing to grant plaintiffs an award of attorney's fees? We vacate the judgments and remand the case for further proceedings not inconsistent with this opinion as more specifically outlined in the concluding paragraph.
 
 
 18
 In Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973) (en banc),[2] after recognizing that multi-member districting schemes are not per se unconstitutional, id. at 1304, we stated that when there is no claim of a racially motivated gerrymander, plaintiff has the burden of proving that a plan operates to dilute the voting strength of racial elements in the population in order to establish the existence of a constitutionally impermissible redistricting plan, and we outlined the factors that prove dilution:
 
 
 19
 (W)here a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts. The fact of dilution is established upon proof of the existence of an aggregate of these factors. . . . (A)ll these factors need not be proved in order to obtain relief.
 
 
 20
 Id. at 1305. See also Wallace v. House, 515 F.2d 619, 623 (5th Cir. 1975) vacated and remanded on other grounds, --- U.S. ----, 96 S.Ct. 1721, 48 L.Ed.2d --- (1976) (per curiam). As indicated in Appendices A and B to this opinion the district court made several findings of fact[3] and then treated each of the standards prescribed in Zimmer, finding that the political process is relatively open now, though not in the past.[4]
 
 
 21
 Having dutifully followed Zimmer, the trial court concluded as follows:
 
 
 22
 "The Court finally ends up with the proposition that the various standards and indicia that have been prescribed by the appellate courts are not helpful one way or the other in this case. And it ends up with this Court having to decide under the basic standards, does the present system, regardless of purpose, operate to minimize or cancel the voting strength of the blacks in the City of Fairfield. After belaboring, as I feel I must under these decisions with the principles that are involved and finding that they don't really help, I come to that question, which is the one I started off with, and I rule in favor of the plaintiffs.
 
 
 23
 I believe that this plan (though not by Fairfield's design) . . . simply does operate to inhibit and has inhibited the voting strength. . . . It is possible and has been that at some particular election that could be reversed, but in practice it has worked that way, and as I view what the Supreme Court has said, that means the system is due to be changed. . . . "
 
 
 24
 While we sympathize with the trial court's dilemma in light of its inconclusive findings, we cannot affirm the ultimate conclusion of a dilution without findings of fact to fit proper standards. To hold merely that the plan unintentionally "simply does act to inhibit and has inhibited voting strength" and that "in practice it has worked that way" is not enough. Before a court can devise a remedial plan, it must first have found a constitutional violation. As the Supreme Court said in Dallas County v. Reese, 421 U.S. 477, 95 S.Ct. 1706, 1708, 44 L.Ed.2d 312, 315 (1975):
 
 
 25
 (A) successful attack raising such a constitutional question must be based on findings in a particular case that a plan in fact operates impermissibly to dilute the voting strength of an identifiable element of the voting population.
 
 
 26
 Such findings must be based on the criteria that the Zimmer and Wallace courts distilled from White v. Regester 412 U.S. 755, 765-767, 93 S.Ct. 2332, 2339-2340, 37 L.Ed.2d 314, 324-325 (1973) and in accordance with all later cases. Unless those criteria in the aggregate point to dilution, i. e., if the criteria "don't really help", then plaintiffs have not met their burden, and their cause must fail. Specifically, the trial court's findings may be read as indicating that elections must be somehow so arranged at any rate where there is evidence of racial bloc voting that black voters elect at least some candidates of their choice regardless of their percentage turnout. This is not what the constitution requires. Therefore, we remand to the district court to reconsider its findings according to the indicia of dilution stated in Zimmer and other cases and to redetermine the ultimate question of dilution vel non in light of its conclusions with respect to these criteria.[5] If fees are awarded by the district court on remand they should be for all of the services of plaintiffs' attorney, including his services on the present appeal.
 
 
 27
 Costs of appeal are taxed against the defendants-appellants. The mandate of this court shall issue forthwith. F.R.A.P. Rule 41(a).
 
 
 28
 VACATED AND REMANDED.
 
 APPENDIX A
 THE COURT:
 
 29
 The Court at this time will enter findings of fact and conclusions of law based on the evidence that has been presented in this case.
 
 
 30
 This evidence consists of testimony from witnesses, interrogatories and answers thereto filed by the parties, and certain documentary evidence in addition.
 
 
 31
 The case is brought into court under the provision of Title 28 for jurisdictional purposes, and Title 42, Section 1983, for purposes of the cause of action. The charge essentially is that the defendants, acting under color of law, have deprived or are depriving certain citizens, namely the plaintiffs, or rights and privileges under the Constitution of the United States. There is no doubt but that the defendants in what they are doing in and about the election process are acting under color of law. Indeed they are acting as directed by state law, and they do not deny that.
 
 
 32
 The City of Fairfield is a municipal corporation which falls in the classification of between twelve thousand and twenty thousand population. Its legislative powers and functions are vested by law in a city council. The city council has plenary power over a variety of activities, including the raising and spending of funds generally, the passage and enactment of ordinance, including improvement ordinances, the awarding of or approval of certain contracts for improvement, the appointment of a number of boards and agencies of the city, and indeed the selection of certain persons to simply be employees of the city on submission or of recommendation from the Personnel Board of Jefferson County. Under the state law which goes back to 1909, the city of the size of Fairfield is directed to elect its councilmen or perhaps the terminology would be council persons which I will reject insofar as this opinion is concerned to elect those by voting at large.
 
 
 33
 Depending upon the number of councilmen to be elected, the law permits or directs that they have residency requirements according to wards that are drawn up or that they be elected at large without regard to particular residences within the city. Fairfield within the statute has elected to have six wards, and under this provision of law this means that there are two councilmen to be elected with respect to each of the six wards, though they are elected by the city as a whole. In addition, there is a president of the council elected by the city at large without regard to residency within the city. And there is a mayor whose duties and functions of course are outlined in state law. Some of the remarks I made about the powers and functions of the city council are, of course, subject to certain companion rights and duties that are given to the mayor by state law.
 
 
 34
 The City of Fairfield is not that different from many other cities in the State of Alabama, at least in the sense that until quite recently blacks were not elected to public office within that city and shared very little of the decision-making processes of the city. Apparently until 1964 there were no blacks appointed to the city boards and agencies of Fairfield, but there have since that time been appointments of black men and women to various positions of leadership within the city. Until 1968 no black, however, had been elected to a city public office in Fairfield.
 
 
 35
 In 1967 blacks qualified to run for city office, one, without regard to residency, being for the position of president of the city council, and the other six running for ward positions. All six of those who ran for ward positions were elected by the voters at large in 1968. The council then from 1968 into 1972 was comprised of seven whites and six blacks.
 
 
 36
 In 1972 there were again blacks and whites qualifying to run for office for the city offices. A larger number of blacks qualified than had in 1968. Fewer whites, I believe, qualified to run in 1972, no doubt as at least in part the consequence of not wanting to fragmentize or split the white vote; and I think perhaps only in one instance was there a vote for a councilman from a ward in which there was more than one white in the original race and facing a black. In the '72 election none of the blacks were elected. And since 1972 then we have a situation that there is a city council of thirteen whites and no blacks and a white mayor.
 
 
 37
 The thing that may make the case a little but unusual is the relatively high proportion of blacks with respect to population in the city. In the 1950 or 1960 census, perhaps both, blacks constituted a majority by a very slim margin of the population of the City of Fairfield. In the 1970 census, black constituted approximately 48 percent of the population of the City of Fairfield. Well, the Court does not have information as to the percentage of registered voters which were black back in the 1950's or even earlier.
 
 
 38
 The Court has been provided by evidence with information about the number of blacks or percentages of blacks on the registration lists in the City of Fairfield for the past seven years or so. It appears that at least by 1968 there were or there was as high a percentage of blacks who were registered as voters within the City of Fairfield as there was of whites. Indeed the evidence presented by the plaintiffs indicated that blacks in the year 1968 constituted a higher percentage of registered voters within the City of Fairfield than they did a percentage of population within the City of Fairfield. This assumes for the type of calculation that the population ratio in '68 was approximately that which was reflected in the census information of 1970, and also assumes that of the 883 persons who were enrolled under the Federal Registration Voters Procedure, virtually all of those were black. The registration of blacks as voters has continued to be relatively high, at least, or I should say, relatively at the same rate as the registration of whites in comparison with population. I should again emphasize this is only speaking to what the situation has been over the last seven years. The Court is not blinding itself to the likelihood that fifteen years ago or at some point blacks were qualified to vote at a much lower percentage than were whites. And indeed there has been evidence of that presented.
 
 
 39
 The voting in the 1968 and 1970 elections has been presented to Court by a series of exhibits. The Court has subjected those to some scrutiny and study. It particularly has made comparisons between the votes received by various candidates in various wards and the population within those wards, and particularly the racial composition of the citizens within those wards. The statistics make clear what has been implicit in the testimony, namely, that in the years 1968 and 1972, race has been a major factor in determining the way people voted within the City of Fairfield at city elections. And there is a very very high correlation between in effect the race of voters and the persons for whom those votes were cast or have been cast in these past two elections.
 
 
 40
 The Court has also made an effort to determine for purposes of this decision what the population is, and the racial composition is in the various wards, based on 1970 census.
 
 
 41
 As pointed out by the plaintiffs in the presentation, there are difficulties because there are six census blocks that cross ward lines, and all but one of the wards, namely, ward 2 is affected by the fact that there are census blocks that cross the ward lines. What the Court has done is to take the minimum population figures, that is, those blocks that are totally within a particular ward, used that as a starting point, also then determined the number of citizens and in turn the number of black citizens that are not covered by an allocation based on these wards totally or these blocks totally within wards. I then have apportioned those so-called excess persons, excess only from a statistical standpoint obviously, among the five wards where there are overlaps, that each of those five wards wards has a possible difference between minimum and maximum population. I have done the same thing with respect to the number of blacks by wards. The figures I come out with are that Ward 1 has a projected population as of 1970 census of 1859 persons of whom 69.77 percent are black, namely, 1297. Ward No. 2 has 1912 persons population in 1970, of whom 88.39 percent or 1690 are black. Ward No. 3 has 1365 persons of whom 52.75 percent or 720 are black. Ward No. 4 has 2590 persons population of whom 59.27 percent or 1535 are black. Ward 5 has 3501 persons in the 1970 population of whom 47.84 percent or 1675 are black. And ward Number 6 has 3142 persons of the 1970 population of which 0.10 or 3 persons are black.
 
 
 42
 The deviation in population between the several wards is to be done by computing the optimum of what the population of the wards would be if they were divided on a numerical basis and then seeing how each ward stands as a percentage of that optimum. If that calculation is done, it appears that Ward No. 3 is only 56.99 percent of the optimum size, while ward No. 5 is 146.18 percent of optimum size, and ward No. 6 is 131.19 percent of optimum size. This further means that there is a maximum deviation by percentage point between the smallest and the largest of the wards of 89.19 percent. That also means that the largest ward by population size is 2.56 times as large as the smallest.
 
 
 43
 I, after having made the calculations, I'm not sure that they are that significant in the total context of this case. If this were a case in which the residents of Ward 5 and Ward 6 were coming before this Court saying that they were adversely affected or having their vote diluted by reason of the ward arrangements, they would have a much stronger case under Reese v. Dallas County, Alabama, on standards enunciated by the Fifth Circuit in December of last year in that case. That case really involved a situation where the identifiable group was totally confined within a single ward or division, and though it represented approximately 50 percent of the vote in the population or total population, it could only elect 25 per cent of the representatives. In this case the identifiable groups that the Court is in essence being asked to look at are whites and blacks; and they are not confined to one or two wards, but indeed are spread throughout the wards, though of course varying as I have indicated already in terms of the different wards.
 
 
 44
 The United States Supreme Court in White v. Regester, has indicated for this Court that if some plan of election by design or otherwise operates to dilute or cancel the voting strength of a racial or political group, then under the Constitution of the United States, Fourteenth Amendment, it is in doubt.
 
 
 45
 There have been a series of cases throughout the country and many in the Southeastern United States which have attempted in the last two years to deal with that pronouncement by the United States Supreme Court. The Fifth Circuit Court of Appeals in Zimmer v. McKeithen, has given the standards for this Court to apply to the pronouncement of the Supreme Court. And this decision by the Fifth Circuit has in turn been applied to a situation for the City of Dothan, Alabama, in February of last year in the case of Yelverton v. Driggers (M.D.Ala.1974, 370 F.Supp. 612).
 
 
 46
 The principal issue for the Court to decide is, does the plan, though required by the state legislature, does it operate to minimize or cancel the voting strength of blacks in the City of Fairfield. It is not for this purpose critical to say that it was intentionally designed for that purpose. Blacks who bring this suit need not prove that. The question is whether it operates to do that. The question is not whether some political group or scientist thinks that individual districts rather than at large multi-membered districts are better and in part counsel for plaintiffs argument suggested that approach. That is not enough, though certainly the Supreme Court has indicated that if a Court is to replace or order some new plan, then there must be unusual circumstances for not ordering one that is based upon individual single districts.
 
 
 47
 Four standards or indicia have been set forth as guidelines, if you will, in making or assisting the Court in arriving at a decision. One is the question of whether the existing system has resulted in a lack of openness to the political process by the complaining group, here blacks in the City of Fairfield. The Court has heard mixed evidence on that point. It is clear that blacks have prevailed in six or seven races which they entered in 1968 under this very system. It also seems probably that had more blacks qualified for ward positions in 1968, there would have been a majority of blacks elected to the city council. On the other hand, it is clear that with that one exception, all other election years under this system for variety of reasons has meant that blacks did not attain representation in the form of another black being elected to the city council. What the Court is left with then on this particular point, and I so conclude, is that it is possible for blacks to prevail under the existing system. But it is also true that that has not been the result with one exception.
 
 
 48
 I should mention that witnesses, I think, have been quite candid, the one that was asked, in saying that there was no difficulty in qualifying to run for the city council. It was essentially from a candidate's standpoint a matter of getting out the vote, of getting more votes than the opponent or opponents did. There is clear evidence that there is a polarization of votes by those who do vote in the City of Fairfield on city elections. It is clear that enough people did not vote who were qualified to vote to have elected nine out of twelve black candidates in 1972 of their own race, black, if they could have been encouraged and helped or assisted to vote. It's also clear that there is some hesitancy as expressed by one of the witnesses, insufficiently encouraging blacks to involve themselves in the electoral process because of some prior difficulty, particularly in terms of difficulties of registration.
 
 
 49
 The Court is given a second indicia or factor for this Court to determine, that is, the history of radial discrimination. I have already indicated that until 1964 there were no blacks on the various boards of the city. The fact that during '68 to '72 when there were blacks on the city council, of almost fifty percent there were a series of blacks appointed to various boards and agencies, indicates rather dramatically the value and significance to the black person in Fairfield of having blacks on the city council. It also makes some dramatic rendering of the prior situation in which blacks essentially did not serve on these boards. Only on one occasion has there been a black majority on any board or agency of the city, and that related to the financing arrangement for a black or predominantly black college. It was significant to the Court that in describing the method for appointment or for replacement of persons whose terms expired on various boards over the last several years, one of the witnesses identified the positions being vacated and the questions of who would be reappointed in terms of there being a white vacancy or a black vacancy, indicating some conscious characterization by city officials to the effect that boards would not become majority dominated by blacks, but only minority. There is little evidence that has been presented to this Court on as to history of racial discrimination, and little evidence presented by the defendants as to lack of racial discrimination.
 
 
 50
 I suppose the Court is being asked to take judicial knowledge or notice of a lot of things. Certainly the Court isn't blind to things that have happened in Jefferson County or in Fairfield or in Alabama. I do not think, however, that it is appropriate to belabor questions of judicial notice in this area. It is certainly true, and the evidence shows that there have been disparities in employment of blacks within the City of Fairfield, black policemen, black firemen, blacks in civil service type jobs or classified service, where only three out of some sixty are black. Only one on occasions. Two out of some twenty policemen have been black, and none of the firemen have been black. That type of evidence certainly demonstrates to the Court's satisfaction that there has been some discrimination involved in times past. Of course there are problems that the city has brought out about some of its hiring policies, and many of them are very dependent upon what some other agent, namely, civil service, may do. Evidence indicated only in one instance has there been a black on the qualification list who has been passed over in recent years in favor of a white.
 
 
 51
 There is much of the evidence that has been focused here on whether or not Fairfield has been responsive to the needs of the black community. And I find it very difficult to deal with this subject matter, though the courts have said to me, that is, the appellate courts have said, this is a key factor in deciding this kind of question. I think it is clear that blacks have gotten far more responsiveness from city council when there were blacks on the city counsel. It's also clear that when there were blacks on the city council, they were more effective in perhaps persuading whites to join them in getting blacks on other city boards. And that way there were blacks on other city boards, though in a minority such as two out of five. They on occasions were successful in having one white join with them to constitute a majority on some particular issue or issues.
 
 
 52
 Accordingly, following this type of approach, one can say that the lack of councilmen who are black certainly contributes to a lack of responsiveness to the needs of the black community. But it is also true, and the evidence shows this, that blacks have not had the door completely closed in their faces insofar as expressing their opinions at city council meetings, in seeking assistance, presenting petitions, being heard, and on some occasions being given what amounts to private audiences for the presentation of these matters. While the witnesses have not been too quick to admit it, the Court has sensed that some of these requests have gotten answers, not to the same degree that the witnesses or that the black communities as a whole wanted, but there has not been a total lack of responsiveness merely because there were no blacks on the city council.
 
 
 53
 The state policy insofar as at large versus district voting is concerned is to this Court's mind rather clear. There is a state policy, and has been for in excess of sixty years, against voting by smaller sub districts in those cities that were less than twenty thousand population. The policy seems clear to the Court that only if a city were larger than twenty thousand was there an opportunity to have district elections as such. What is not clear to the Court, and neither side has introduced evidence, is whether this initial policy of the state legislature back in 1909 was in any way grounded upon racial consideration or not. Now other courts have found and taken judicial notice of the fact that the 1901 Constitutional Convention in the State of Alabama was almost primarily directed and related to questions of racial concern and of assuring or attempting to insure that whites would be able to control the political processes in the state. Whether the Court can in any way assume that a 1909 act passed by the legislature which is only eight years after a racially oriented Constitutional Convention has any relationship, I'm not sure. I think that a reasonable hypothesis is that this particular matter dealing with at large elections in cities of less than twenty thousand had no racial overtones, but there is no evidence really for the Court one way or the other. It would be pure guesswork as to what might have been the considerations for that passage.
 
 
 54
 Finally, the Court has been told by a series of appellate decisions to look at a variety of additional factors such as the fact that people run for positions and hence there can be no single shot vote in a multi-member race that might be utilized by a minority to elect someone.
 
 
 55
 The Court finally ends up with the proposition that the various standards and indicia that have been prescribed by the appellate courts are not helpful one way or the other in this case. And it ends up with this Court having to decide under the basic standards, does the present system, regardless of purpose, operate to minimize or cancel the voting strength of the blacks in the City of Fairfield. After belaboring, as I feel I must under these decisions with the principles that are involved and finding that they don't really help, I come to that question, which is the one I started off with, and I rule in favor of the plaintiffs.
 
 
 56
 I believe that this plan and this is not that the City of Fairfield has intentionally designed it; it came from the state legislature simply does operate to inhibit and has inhibited the voting strength, which has been from 53 per cent to the present 48 per cent or to a turnout rate of 42 per cent, to effectively diminish that voting strength. It is possible and has been that at some particular election that could be reversed, but in practice it has worked that way, and as I view what the Supreme Court has said, that means the system is due to be changed, is due to be changed giving the preference as the Supreme Court has directed to a single member smaller district which will be elected merely by the people of that particular district and where the size of those particular districts is consistent with the one-man-one-vote principle, which means pretty nearly the same population in each of the districts.
 
 
 57
 It is not clear to the Court that there is a need for the Court to direct that there be thirteen or fourteen or six or seven districts. I think the question of how many wards would then be electing groups is a matter to some degree of playing with what you have got, the size of areas and the population and configuration. Although the state statute comprehends typically fourteen councilmen, it also comprehends, for example, a system of five councilmen in another way. And I'm not sure that in terms of formulating some plan to carry out the Court's direction, the parties should necessarily be bound to fourteen districts.
 
 
 58
 The question may arise as to whether there may be some councilmen elected by district, and then others elected at large. I would say that no more than one could be elected at large. Whether one can be elected at large or not is I think an open question, and I would be willing to see. I think that is the way we ought to handle it, depending on whether there is a request under a plan for there to be one such as council president to be elected at large. There have been some decisions by a variety of courts that have struck down a system, even where there are only two at large, and the rest are by smaller districts. The elections are due in August of 1976.
 
 
 59
 There should be presented, I think, by the parties, and each party certainly has an interest in this, a plan to accomplish the direction of the Court. I would think that the plans should be presented by June 1st. I don't want to put it off too long, but I think there should be adequate amount of time to look at it and study it and perhaps to use the resources of different groups in the community as well as perhaps outside assistance. I think June 1st would be adequate and still leave plenty of time after that for consideration and decision, if there is no agreement by the parties, and still be able to have that in plenty of time prior to the August, 1976 election.
 
 
 60
 Perhaps there are questions by the parties that I should pause for.
 
 MR. BARNES:
 
 61
 May it please the Court, the question naturally arises about questions on appeal from the Court's decision today, and I'm in doubt whether this is a final judgment.
 
 THE COURT:
 
 62
 This would not be a final decision. However, since that only deals with the next election, and does not in any way disenfranchise the present council, and there is nothing appealable immediately, it sought to be appealable after a new plan is developed. For example, there could be an appeal from the Court's requirement for a plan and for what the Court finally determines in direction of the plan, one appeal instead of two. We still have plenty of time, if we do it that way. It may be, since you mentioned it, we ought not to put it off until June 1st to present a plan. Would the parties feel that May 1st is adequate time in which to develop a plan consistent with the direction of the Court?
 
 MR. STILL:
 
 63
 Your Honor, we can have a plan ready for the Court by the first of May.
 
 THE COURT:
 
 64
 What will be the position of the defendants?
 
 MAYOR SIDES:
 
 65
 I think we can have it ready by May 1st.
 
 THE COURT:
 
 66
 Let's push that date back then to May 1st as the time for submitting reports with suggested plan or plans. It's possible there could be more than one that will be presented as an option.
 
 
 67
 Are there other questions by the parties?
 
 MR. STILL:
 
 68
 No, sir.
 
 THE COURT:
 
 69
 Then the case will stand on this decision, though it does not constitute an appealable judgment, that will have to await approval of a plan so that that will be appealable also.
 
 
 70
 (Whereupon, proceedings were adjourned at 4:04 P.M., February 20, 1975)
 
 END OF PROCEEDINGS
 APPENDIX B
 THE COURT:
 
 71
 The Court will now indicate certain findings and conclusions. These are based upon the evidence that has been produced in this case today together with the plans that have been submitted and received by the Court from the parties prior to today.
 
 
 72
 Additionally, the court, of course, has before it the matters that were produced and heard in evidence back in February, for what bearing such evidence may have on the adoption of an appropriate plan.
 
 
 73
 The Court has already indicated that though it considered the matter close, it was adhering to its conclusion announced in February. Namely, that the existing plan for election of alderman unconstitutionally dilutes the voting rights of black citizens in the City of Fairfield. The Court in February indicated that there should, therefore, be presented appropriate plans to alter for future elections the election method for alderman for the City of Fairfield. It indicated at that time that the basic approach should be through the creation of wards or election districts from which in the future persons would be elected solely by the voters residing in such districts.
 
 
 74
 The Court in February indicated that in devising such district plans the parties should be aware that such districts would have to comply not merely with the problems of avoiding dilution of voting rights by particular groups of citizens, but also avoiding running afoul of the so-called one man-one vote principles as announced and enforced by the Supreme Court and other appellate courts.
 
 
 75
 The Court has received six different plans, four by the plaintiffs and two by the defendants. The Court should adopt one of the plans proposed by the defendants, if possible.
 
 
 76
 The Court finds that it is not possible to adopt either of the plans proposed at this point by the defendants.
 
 
 77
 The Court's conclusion is that the plans as submitted run afoul of the one man-one vote requirement. The plans as submitted by the City Council that is, the plan as submitted by the City Council utilizing (a) the 1970 census figures and (b) those figures as adjusted by certain proposed changes submitted here today, nevertheless reflect that there is a deviation as expressed in percentage points between the two districts as having the highest and lowest number of people in them, which insofar as the 1970 census is concerned, reflects a variation of 62 percent. Even with crediting adjustments suggested by the defendants reflect a 37 percent variance or span of deviation.
 
 
 78
 The Mayor's plan, which has not been elaborated upon in this hearing this morning is one that would utilize five separate districts. It likewise has been evaluated in terms of the 1970 census and the '70 census as modified by certain proposed adjustments. It would reflect, viewed upon the 1970 census, a maximum percentage deviation span of some 51 percent, or considering the proposed adjustments, a maximum deviation percentage span of 27 percent. These percentages are far beyond that which is acceptable under the one-man one-vote doctrine. At least that is so where there are not clear historical reasons for identifying and treating the districts uniquely, as might be the case for example, in recognizing that counties have certain unique qualities. These rather are simply parts of cities which have no unique special governmental characteristics insofar as wards are concerned.
 
 
 79
 The fact that the deviation is unacceptable is also supported by the facts that plaintiffs have indicated that that range of variation can be avoided by other configurations.
 
 
 80
 The plaintiffs have come forward with four plans. The maximum variation under these four plans is less than three percent variation between the largest and smallest. That three percent is to be contrasted as to above twenty percent as reflected in the one plan submitted by the mayor, which has the least amount of deviation in any plan submitted by the defendants.
 
 
 81
 So, it is certainly possible to find arrangements that do not have the kind of variation as reflected in the defendants' plans.
 
 
 82
 The plaintiffs' figures do not reflect changes since 1970 in population. If full credit be given to the evidence presented by the defendants today as to certain changes in population, it would indicate that there would be significant variations in population under the plans submitted by the plaintiffs. I think it is possible and proper in an appropriate case to consider changes in population from a preceding census. Nevertheless, such changes should only be considered where they are reasonably accurate and reliable in terms of indicating the present population or the population in some particular point in time.
 
 
 83
 With all due respect for the witness, Mr. Ellison, I do not believe that the projections as to population changes from 1970 as suggested by his testimony are such as to be reasonably reliable. There are simply too many variables that have not been taken into account. Indeed, some matters that have been brought out suggest that there are infirmatives by the approach developed by him in an attempt to find out what the present population is.
 
 
 84
 As will be indicated in a few minutes, there may be a special census yet to be taken by the city. That special census may justify changes from any plan the Court, in effect, puts into effect now.
 
 
 85
 I do not fault the defendants in any way for suggesting changes in population or for being unable to show results of a special census. I think all the parties were agreed, however, that it was desirable to go forward now with the adoption of some proposed plan so that that might be reviewed upon appeal, and that it was not wise to simply defer this type of proceeding until some time after a special census might be obtained during the summer.
 
 
 86
 I find that I cannot accept the plans suggested by the defendants.
 
 
 87
 I turn my attention to whether the plans, one or more of them, by the plaintiffs, should be at least tentatively mandated by the Court subject to certain adjustments that I will talk about.
 
 
 88
 I do find that these plans do meet the one-man one-vote test insofar as the 1970 census is concerned. Though, it might turn out that they would not, were a special census to be taken.
 
 
 89
 In looking at the several plans that the plaintiffs have suggested, the court has attempted to follow certain suggestions that, in effect, both sides seem to present. One is that the total voting members on the Council should be an odd number so as to minimize chances of ties. Another is that it is probably preferable to have the number of districts of something less than ten, for example. Even though this would reduce the number of Council members, this seems to me to be rather implicit in certain of the matters that the plaintiffs have suggested as well as being implicit in what the defendants have suggested.
 
 
 90
 The Court has been troubled in that it did not want to be involved in mandating if it could be avoided, a significant reduction in the number of elected aldermen contrary to the wishes of the people of Fairfield. There is a Supreme Court decision involving changes or reapportionment of a state legislature in Minnesota that, in effect, indicated drastic or significant reduction in size of an elected body should not be mandated by the court under the guise of reapportionment if there were other alternatives available. That was Minnesota State Senate versus Bean.
 
 
 91
 In this particular case, however, the State law leaves open to the individual cities a fair amount of freedom in determining the size of its city council. It would appear that probably the State law is broad and flexible enough to permit a city to choose to have a city council composed of four, six, eight, nine, ten, eleven, twelve, thirteen, or fourteen members plus a council president.
 
 
 92
 The city council and the mayor, by responding to the Court's request for a plan here, by suggesting five or six district plans, have indicated, as I view it, to the Court, that if there is to be a district type election that they would prefer not to have, for example, twelve districts, even though they recognized, according to the council president, that it would be easy enough under their own plan to simply subdivide their six proposed districts, and to come up with a twelve district plan. They have chosen not to do so. So, I take it that there is no policy, from the standpoint of the defendants, to suggest that a large council, that is, something in excess of ten, be established through a large number of districts.
 
 
 93
 Accordingly, I do not feel that the Court is restricted in this particular case from adopting or approving a plan with something less than twelve districts, even though that would mean a reduction in the total number of aldermen on the City Council. I take it that is, in effect, the preference if there is going to be a district plan, that there be some reduction.
 
 
 94
 One of the principal problems is whether or not there should be any at large elections, that is, other than mayor. I believe that there should be, given the facts of this case, an at large election of a president of the City Council. Under Alabama law, the president of the city council does have some unique powers and responsibilities different or in addition to those possessed by the other council members. He is or she is empowered, in effect, to act as mayor during the absence or disability of the mayor. The provisions of Section 428 of Title 37 along with certain opinions of the Attorney General of the State of Alabama indicate the president of the City Council has a special role to play in City government. Of course, if to have such an at large election would result in something that would dilute or cause a dilution of the voting of a particular minority group that might be precluded, but if it can be done in such a way as to preserve an at large election of a president, I believe that is preferable given State policy consideration.
 
 
 95
 I believe that the eight member plan as suggested by the plaintiff, coupled with the at large election of a president of the City Council is a very meaningful and satisfactory resolution of this situation. The maximum deviation range expressed in percentage points for the eight persons who would be elected to the council is only 1.89 percent, and the average percentage deviation is point fifty-eight of one percent.
 
 
 96
 Assuming that the voters were, by and large, to follow racial lines in selecting aldermen it would in effect insure that of the total nine member council, that is, counting the president as a member of the council, it would in essence assure that whites would have at least three members on the total voting council and that blacks would have at least three voting members on the council. In effect, three additional members would be to some degree up for grabs, depending upon voter turn out, interest and voter patterns. If there were the same percentage of whites and blacks registering to vote and then turning out to vote on a particular election, if they followed voting racial patterns in how they voted, it would mean there would be five whites and five blacks elected, which is relatively comparable to the population proportion within the city. If the whites, again assuming there were this racial pattern in voting, if the whites, in effect got out their vote in a particular election, then, presumably six of the nine seats on the council would be held by whites. If the blacks, in effect, got out their vote to a greater degree than the whites, the blacks could elect six out of nine seats. I don't think it is required that the Court, and I would not do this, come up with some plan or the parties come up with a plan that would guarantee that whites or blacks have a certain number of seats. In selecting between several plans that are available, perhaps some credence should be given to the extent to which the expected voter participation might be generally reflective of the population characteristics.
 
 
 97
 I think, then, and will so indicate by separate judgment that really just reflects the ultimate conclusion, that for the next election there should be an eight member ward elected city council following the outline of those districts as contained in the plaintiffs' plan, together with an at large election of a president of the city council.
 
 
 98
 This judgment, however, should be subject to being modified, that is, the Court should retain jurisdiction if and as necessary so that if there is a special census undertaken, the City Council should, or city government should have the opportunity to come in and request some modification from this plan based upon the results of such a special census.
 
 
 99
 Any such plan, I would suggest, that might be proposed must take greater account of the one-man one-vote principle than was true in the plans that the Court has had presented to it prior to this time by the defendants. Furthermore, I think it is well to indicate that if district wide plans that are suggested by decision makers who are all white shows a likely increase of white positions over that which would be expected on a purely population basis, there may be some need to sort of justify that the plan they are coming up with is not in any way calculated or motivated in that respect. I am not saying that any such plan, for example, would have to follow to any mathematical degree the voter population figures. If, for example, only there were to be a special census and a plan suggested to the Court which would show that probably 72 percent of the Council members would be white whereas only 53 percent of the population was white, I think the Court would be at least somewhat skeptical and suspicious as to whether there was some other arrangement that would be a little bit more compatible with the legitimate voting interest of the minority. I say that only by way of indicating a type of attitude and not by way of saying there is any requirement as to any particular plan or lack of it.
 
 
 100
 So, the Court will enter a final judgment as indicated. Of course, that judgment will be subject to appeal. I take it there will be an appeal of it. Upon a resolution of an appeal, should there be an affirmance, in effect, the Court will have retained jurisdiction over the case so as to be able to give consideration to some other plan that might be developed out of information obtained from a special census.
 
 
 101
 Do counsel have any questions as to the nature of the Court's ruling?
 
 
 102
 (No response.)
 
 THE COURT:
 
 103
 The costs will be taxed against the defendants.
 
 
 104
 No attorneys' fees will be awarded pursuant to the Supreme Court's decision of last week.
 
 MR. STILL:
 
 105
 Your Honor, if I may make one statement on that. We would appreciate an opportunity to make a motion for attorneys' fees and present a brief as to why we believe the Wilderness Society versus Morton is inapplicable in the present situation.
 
 THE COURT:
 
 106
 Well, I am going to take it that you have orally made a motion at this time to that effect. I find that there is no common trust fund produced by your efforts, that there is no recalcitrant attitude or punitive measure that is due to be taken against the defendants that might otherwise, perhaps, be a basis for attorney's fees. That while there might be justification for a claim based on the private attorney general theory, that that has effectively been knocked out by the Supreme Court's decision.
 
 MR. DAWSON:
 
 107
 Your Honor, we might further ask that to be included in the cost to be taxed here would be a reasonable sum for the assistance provided to the Court in the drawings of these various plans.
 
 THE COURT:
 
 108
 The questions of cost are dealt with separately and are not matters that affect appellant's remedy.
 
 
 109
 You may present in an application on the cost bill such matters. I would have to say that I will be very skeptical as to the allowability of any expenses.
 
 MR. BARNES:
 
 110
 May I ask that if a census should show a substantial change that that might affect the rights of either party to ask for a change in the number of districts.
 
 THE COURT:
 
 111
 Yes. I see the plan that the Court is in effect saying or approving at this point as being subject to modification, whether it is as to number of districts or size and location of them.
 
 
 112
 Are there any other questions?
 
 
 113
 (No response.)
 
 
 114
 END OF PROCEEDING.
 
 
 
 [1]
 Ala.Code tit. 37, § 426 (Supp.1973):
 "Election of president of council and aldermen. In cities having a population of twelve thousand or more, there shall be elected at each general municipal election the following officers, who shall compose the city council for such cities, and who shall hold office for four years and until their successors are elected and qualified, and who shall exercise the legislative functions of city government and any other powers and duties which are or may be vested by law in the city council or its members: A president of the city council, and in cities having seven wards or less, two aldermen from each ward, to be elected by the qualified voters of the several wards voting separately in every ward; except in cities of less than twenty thousand population, in which two aldermen from each ward shall be elected by the electors of the city at large; in cities having more than seven wards, one alderman from each ward, and a sufficient number of aldermen from the city at large to make the total number of aldermen fourteen exclusive of the president of the council; and in cities having fifty thousand population or more the city council may create not exceeding twenty wards. The president of the council shall have the right to vote on all questions the same as any other member of the council Provided however, that the city council of any city having a population of twelve thousand or more may by ordinance or resolution, if adopted by two-thirds vote of the city council more than six months prior to any general municipal election, provide that the city council of said city shall consist of five aldermen to be elected from the city at large. And provided further, that the city council of any city having a population of more than thirty thousand, according to the last or any subsequent federal decennial census, or according to any census of such city made pursuant to article 3 of chapter 10 of this title, or Act No. 845 of the Acts of 1953 (sections 481(1) and 481(2) of this title,) and having only five wards, may, by ordinance or resolution adopted by two-thirds vote of the city council, at least six months prior to a general municipal election, provide that the city council shall consist of a president and five aldermen. If such an ordinance or resolution is adopted one alderman shall reside in each of the respective wards of the city, the president and all the aldermen shall be elected by the voters of the city at large, and the president shall vote only in case of a tie." (emphasis added)
 The complaint seeking declaratory and injunctive relief was filed May 30, 1973. Without dispute, the population of Fairfield is between 12,000 and 20,000. For purposes of conducting municipal elections, the City is divided into six wards, each containing an approximately equal number of voters. Two council members residing in each ward are elected at-large by the voters. The Mayor of Fairfield whose duties and functions are outlined by state law, is also elected by the voters of the City as a whole. In addition, there is a president of the city council elected by the City voters at-large. The legislative powers and certain other functions are vested in the city council which has a total membership of thirteen, that is, the twelve regular council members plus the president of the City Council.
 
 
 [2]
 Affirmed " . . . but without approval of the constitutional views expressed by the Court of Appeals" East Carroll Parish School v. Marshall, --- U.S. ----, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976)
 
 
 [3]
 The court determined that blacks represent 48% of the population in Fairfield and have at least 50% of the registered voters while the figures show that blacks have 500 fewer registered voters, the lower court found that since federal registrars registered 585 voters under the Voting Rights Act, most of those presumably black, blacks have at least as many, if not more, registered voters now; that blacks had won six of the thirteen council positions in 1968, which was the first time, with one exception, that any black had won a position on the council; that no blacks won in 1972, but that if blacks had voted in the same percentage as whites, they would have elected nine council members (assuming bloc voting); and that there has been substantial bloc voting. The foregoing is paraphrased from the Appendices
 
 
 [4]
 The court said: "(I)t is possible for blacks to prevail under the existing system. But . . . that has not been the result with one exception."; the district court further concluded that there has been racial discrimination in the past, but that apparently there has been none in recent years; that the political process has been far more responsive when blacks were on the city council, but not totally unresponsive when blacks were not represented. The foregoing is paraphrased from the Appendices
 
 
 [5]
 If the district court on remand properly finds unconstitutional dilution, then the district court should reconsider its addition of one at-large member to an otherwise single-member district plan in light of the intervening Supreme Court decision in East Carroll Parish School Bd. v. Marshall, --- U.S. ----, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), aff'g Zimmer v. McKeithen, 485 F.2d 1297 (1973) (en banc), which reaffirmed the rule that when district courts must fashion a reapportionment plan to replace state legislation found constitutionally infirm, it should adopt a single-member-district arrangement unless there are "special circumstances." Id. --- U.S. at ----, 96 S.Ct. at 1085, at 299. See also Wallace v. House, --- U.S. ----, 96 S.Ct. 1721, 47 L.Ed.2d 296, 44 U.S.L.W. 3607 (1976) (granting certiorari from our decision, 515 F.2d 619 (5th Cir. 1975) which fashioned a "mixed" plan with one of five aldermen elected at-large) vacating the judgment, and remanding for reconsideration in light of East Carroll; Beer v. United States, --- U.S. ----, ---- - ----, 47 L.Ed.2d 296, 639-40 (1976). If it finds dilution, the lower court should also reconsider its denial of attorney's fees in light of section 402 of the Voting Rights Act amendments of 1975, P.L. 94-73, which adds a new section 14(e) to Voting Rights Act, 42 U.S.C. § 1973l (e) that gives the district court discretion to authorize recovery of attorney's fees by prevailing party in any action to enforce voting rights created by the fourteenth and fifteenth amendments. For the statute's application to reapportionment suits under 42 U.S.C. § 1983 (1970), see 121 Cong.Rec. 4735 (daily ed. June. 2, 1975) (remarks of Congressman Drinan); id. at 4720 (remarks of Congressman Edwards); S.Rep.No.94-295, 94th Cong., 1st Sess. 40 (1975), U.S.Code Cong. & Admin.News 1975, p. 774