**BLACKS UNITED FOR LASTING LEADERSHIP, INC., et al.,**

v.

**The CITY OF SHREVEPORT, LOUISIANA, et al.,**

**Louisiana Municipal Association, Intervenor.**

Civ. A. No. 74–272.

United States District Court, W. D. Louisiana, Shreveport Division.

July 16, 1976.

Hilry Huckaby, III, Shreveport, La., Charles E. Williams, III, Jack Greenberg, NAACP Legal Defense Fund, New York City, Robert E. Piper, Jr., Shreveport, La., for plaintiffs.

John Gallagher, Neil Dixon, Roland J. Achee, Charles C. Grubb, Shreveport, La., for all defendants except Edwin Edwards and Wade O. Martin, Jr.

William J. Guste, Jr., Atty. Gen. of La., Baton Rouge, La., A. Mills McCawley, Asst. Atty. Gen. of La., Shreveport, La., for Edwin Edwards and Wade O. Martin, Jr.

R. Gordon Kean, Jr., Baton Rouge, La., for intervenor.

DAWKINS, Senior District Judge.

## I.

It is our duty here to determine the constitutional validity *vel non* of the at-large scheme of electing Commissioners under the commission form of municipal government subsisting in the City of Shreveport, Louisiana, population approximately 194,000. Blacks United for Lasting Leadership (B.U.L.L.),[1] an organization of black citizens of Shreveport, brought this class action for declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.[2]

---

1. The purpose of B.U.L.L., as stated in its corporate charter, is to secure the rights of black persons in the City of Shreveport. Other named plaintiffs are: Citizens Leadership Conference of Louisiana, Inc., another corporation of Shreveport blacks whose aim is the furtherance of political, civic, and social interests and civil rights of local blacks; Hilry Huckaby, III; and the Reverend Earl P. Wimberly. The individual plaintiffs are qualified, registered voters of Shreveport.

The Louisiana Municipal Association was granted leave to intervene; however, it did not participate further by adducing evidence or filing a brief.

2. 28 U.S.C. § 2201 provides:

"In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether

These acronymic plaintiffs contend that, within the particular factual framework presented here, at-large elections have the dual purpose and/or effect of (1) diluting racial minority voting strength in violation of the Equal Protection Clause of the Fourteenth Amendment and (2) denying or abridging the right to vote on account of race, color, or previous condition of servitude, as proscribed by the Fifteenth Amendment. They seek a declaratory judgment holding that these contentions are valid, and that an injunction prohibiting further at-large elections issue, encompassing an order requiring defendants to submit a proposed plan apportioning Shreveport into five single-member districts.

Named originally as defendants were the City of Shreveport; L. Calhoun Allen, Jr., individually and in his capacity as Mayor of Shreveport and member of the City Council; George W. D'Artois, William Collins, George Burton, Jr., and Donald Hathaway, individually and in their respective capacities as Commissioners of Shreveport and members of the City Council; Edwin W. Edwards, in his official capacity as Governor of Louisiana; and Wade O. Martin, Jr., in his official capacity as Secretary of State of Louisiana.[3] All defendants deny that at-large election of Shreveport's Mayor and

Commissioners operates invidiously to minimize or cancel the voting power of black electors.

Jurisdiction is conferred upon us by 28 U.S.C. § 1343(3).

 Early in April of 1974, the local officials filed numerous pre-trial motions seeking dismissal of the complaint, or, in the alternative, for summary judgment. We heard oral argument upon the motions on April 29, 1974; then scheduled an evidentiary hearing upon the entire matter and deferred all motions to the merits. Rule 12(d), F.R.Civ.P.[4] That hearing was held on May 2 and 3, 1974, following which we adjourned subject to resumption of the hearing on May 30. After a conference held with counsel in chambers immediately prior to resumption of the evidentiary hearing, out of an abundance of caution (since there are several other municipalities in this State with a commission-council form of government), we ordered, *sua sponte,* all parties to brief the law as to whether a three-judge district court should be convened. After study of that law, we determined that the case properly should proceed before a single judge and instructed counsel that we would reset the case for trial following substantial completion of discovery.[5]

---

or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

42 U.S.C. § 1983 *provides:*

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

3. All parties correctly agree that we are without jurisdiction over the City, as such, inasmuch as municipalities are not "persons" against whom equitable relief may be sought under § 1983. *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973).

4. Defendants contend as grounds for dismissal that (1) the Executive Democratic Committee and the City of Shreveport Executive Republi-

can Committee, local political party organizations, were not joined as defendants, and full and complete relief could not be accorded without their presence; and (2) the complaint failed to state a claim upon which relief can be granted. Defendants further moved to dismiss B.U. L.L. and the Citizens' Leadership Conference as plaintiffs, arguing that these organizations were neither real parties in interest nor proper class representatives, because neither was a qualified elector of Shreveport. Rules 17, 23, F.R.Civ.P. Finally, the local defendants contend that they "are . . . agent[s] or arm[s] of the City and as such any suit for damages, costs, etc. must be brought against them individually only and not in their official capacity [*sic*] since the City of Shreveport is not a real person under the Civil Rights Act" of 1871.

None of these motions has merit; accordingly, all are denied.

5. We determined that the thrust of plaintiffs' attack is against the form of government authorized by the Charter of the City of Shreveport. It is not an attack upon any statute of

Bench trial of the issues resumed April 21, 1975; it was completed the following day. Upon conclusion of introduction of evidence, we took the case under advisement pending filing of the official transcript of proceedings and submission of post-trial briefs thereafter. (The final brief for defendants was filed on June 1, 1976.)

We now carefully have considered all evidence adduced at trial, the exhibits in the record, exhaustive briefs filed by counsel, and controlling principles of law. For the reasons which follow, we find that the evidence and applicable law support only one conclusion: that the commission-council form of municipal government in Shreveport, requiring at-large election of all Commissioners, within the framework of facts and circumstances peculiar to this city, operates impermissibly to dilute the minority voting strength of black electors. Members of that class have "less opportunity than [do] other Marion County residents [in the city] to participate in the political process and to elect legislators of their choice." *Whitcomb v. Chavis,* 403 U.S. 124, at 149, 91 S.Ct. 1858, at 1872, 29 L.Ed.2d 363 (1971); *White v. Regester,* 412 U.S. 755, at 766, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

The Louisiana Legislature, by Act 529 of 1948, proposed the addition of § 37 to Article 14 of the Louisiana Constitution of 1921, authorizing the City of Shreveport to operate its municipal government under a so-called "Home Rule Charter." In accord with then controlling State law, this proposed constitutional amendment was submitted to the qualified electors of Louisiana and passed at the November general election of 1948. Pursuant to that enabling proviso, the electorate of Shreveport voted in 1950 to adopt a locally drafted Charter providing for the commission form of government. In fact, however, that decision brought only minor alterations to the *status quo,* for Shreveport has functioned under a commission form of city government since 1910.[6]

The present Commission-Council is composed of five members. They are: (1) the Mayor, who presides over the City Council, is a voting member thereof, and conducts the Public Affairs Department of the city, including the Department of Recreation; (2) the Commissioner of Public Safety, head of the Police and Fire Departments; (3) the Commissioner of Public Works, director of the Department of Streets and Sanitation; (4) the Commissioner of Public Utilities, who heads the Department of Water and Sewerage; and (4) the Commissioner of Finance, executive officer of the Department of Finance. By operation of law, the latter also is Vice-Mayor, serving as the city's chief executive in the event of the Mayor's absence or disability.

The duties, powers, and responsibilities of the Mayor and Commissioners are detailed in the local City Charter. Following the aim of commission plans generally, that is, with a view to operate the city government in a businesslike fashion, the Charter vests in each official specific executive and administrative powers and responsibilities,

State-wide application. Thus it was not necessary to convene a three-judge court pursuant to 28 U.S.C. § 2281, for where the statute, ordinance, rule, regulation, or, in this case, charter, merely is of local import, a single judge must decide the controversy. *Board of Regents of University of Texas System v. New Left Education Project,* 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972); *Moody v. Flowers,* 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967).

**6.** Shreveport's implementation of the commission form of city government followed closely the nation's first experiment with that plan in Galveston, Texas, also in 1910. Galveston, a Gulf Coast city, had been destroyed by a powerful hurricane and accompanying tidal wave.

Intent upon prompt and efficient restoration of governmental services, a group of small businessmen devised the commission form of city government, adopting many features of traditional corporate structure and management. The Galveston plan provided for a five-member commission, combining the powers which ordinarily would vest in the mayor and aldermen under an aldermanic scheme, the prevalent form of local government around the turn of the century. Shreveport's present commission form of government is strikingly similar.

For an interesting, well documented narration of the evolution of the commission form of local government, see *Kendrick v. Walder,* 527 F.2d 44 (7th Cir., 1975) (Pell, J., dissenting).

largely entailing management and supervision of departmental affairs. Testimony of the incumbents illustrates that no more than ten to fifteen per cent of their working hours are spent addressing and deciding legislative issues, at bi-weekly sessions of the City Council.

The Charter specifically provides that "candidates [for election] shall announce for mayor or for a designated commissionership . . . ." § 3.02. This requirement has an effect similar to the so-called "place" rule, limiting candidates from multi-member districts to a particular "place" on the ballot, thereby insuring that each race for office will be a "head-to-head" contest between candidates (or perhaps among several candidates in a first primary election) for a specified position on the City Council. There is no residency requirement; candidates may reside anywhere within Shreveport's corporate limits.

Operating jointly with these Charter provisions is Louisiana's "majority primary" law, which controls the conduct of municipal elections in Shreveport under § 3.02 of the City Charter.[7] State law provides in part that, following the first primary election:

"... If any candidate has failed to receive a majority of the votes cast for the office for which he was a candidate, . . . . a second primary shall be held . . . . .

"B. In the second primary only the two candidates who received the greatest number of votes in the first primary shall be voted on." La.R.S. 18:358.

While these features of Shreveport's municipal elections cannot be characterized as invidious *per se, White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. 2332, they nonetheless "enhance . . . the opportunity for racial discrimination." *Id.* at 766, 93 S.Ct. at 2340. We fully recognize that logic seems to suggest that candidates for the city council be compelled to seek a particular post. Specialized skills (if possessed) necessary for the performance of the duties of one commissionership are not the same as those required for others, and a candidate's declaration of intent better enables voters intelligently to decide who among several candidates for a particular office has the qualifications and experience best suited to overall job performance. Notwithstanding, we may not ignore the likely result which follows when this procedure functions in tandem with the "majority primary" rule—the "ultimate effect is to highlight the racial element where it does exist." *Graves v. Barnes,* 343 F.Supp. 704, at 725 (three-judge court W.D.Tex., 1972) aff'd *sub nom. White v. Regester, supra.*[8] Thus, where voting is polarized along racial lines, as here, and whites comprise a strong majority of the registered voters, with all candidates elected at-large, it indeed is highly unlikely that any black person, in the foreseeable future, will receive a majority of votes cast in any primary election for city office, and black persons plainly have been discouraged from seeking office by this inevitability of defeat.[9]

Only one black person has sought election to the City Council. In 1962, a black man entered the mayoral election and, although he ran well in predominantly black precincts, he received only twelve per cent of the votes cast city-wide. There is no reason to expect that a dissimilar result would

---

7. § 3.02 provides in part that:

"... primary . . . [elections] . . . . shall be conducted in accordance with the provisions of the . . . primary [election] laws of the State of Louisiana . . . ."

8. "The majority vote requirement can hardly be said to have been intentionally passed for the purpose of diluting the newly-created black vote, for it has been the law of Louisiana since at least 1898. *See* Louisiana Acts of 1898, No. 136." *Wallace v. House,* 515 F.2d 619, at 624,

n. 3 (5th Cir., 1975). However, we are concerned with the effect of the rule—not with the collective consciousness of the legislature which enacted it.

9. In contrast, black persons now regularly are elected to the Caddo Parish School Board and Police Jury, both of which have been reapportioned into single-member districts by this Court. See also population ratios, separate black and white neighborhoods, etc., described *infra.*

ensue now were a black person to seek election to the Council, for evidence shows that Shreveporters continue to cast their ballots along racial lines. For example, in 1970, the voters of Shreveport were presented a proposal which would have revised the City Charter, implementing a Mayor-Council form of government. It was widely known among voters that, under the proposed revision, Council members would be elected from single-member districts, some of which would have a predominantly black constituency. Notwithstanding strong support by blacks at the polls, the proposal soundly was defeated in a city-wide referendum.

In 1974, a black man sought election to the office of Judge of the First Judicial District Court of Louisiana, Caddo Parish, in a race which pitted him against two white candidates. Voters in the fourteen predominantly black precincts within Shreveport cast 89.8 per cent of their ballots for the black office seeker. One of his white opponents, the winner of the election, easily carried precincts with 90 per cent white population, or more, with some 70 per cent of the vote. This occurred even though the black candidate had strong support among white members of the local bar. The combined percentage of votes received by the two white candidates in white precincts was 84.3 per cent.

Looking, as we must, at the past history of official racial discrimination, *White v. Regester, supra,* we find that Shreveport is one of the few larger cities to which federal registrars were assigned pursuant to § 6 of the Voting Rights Act of 1965. These registrars were ordered here by the United States Attorney General to bring about compliance with the Constitution and laws of the United States regarding the rights of black citizens of lawful age to register and vote.

Prior to passage of the Voting Rights Act, white persons were permitted to register with minor errors in their application forms, and in some instances the locally appointed Registrar assisted whites in completing applications correctly. Blacks, on the other hand, were rejected because of similar errors, effectively freezing the number of registered black voters. During the period from June, 1960, to July, 1965, almost 2,000 white persons were registered to vote in Caddo Parish (in which Shreveport is the largest city); black registration increased by 103.

Immediately following passage of the Voting Rights Act, black registration remained disproportionately low because of unreasonably strict requirements for proof of residency or identification. During one two-month span, 337 blacks were rejected on purported grounds of inadequate satisfaction of these criteria Fifteen white applicants were denied registration for similar reasons.[10]

■ In addition to this history of official discrimination touching the rights of Negroes to participate in local political processes, we judicially notice that until recently *de jure* segregation, under both State statute and local ordinance, affected the lives of all black persons. They have suffered the stigma of segregated schools, separate public accommodations for food and lodging, separate public recreational facilities, segregated seating areas on public conveyances, and separate public restrooms and water fountains. In short, blacks have been subjected to legally imposed cultural deprivations among a white majority, the results of which, as shown *infra,* have not entirely vanished.

Shreveport presently is the second largest city in Louisiana. 1970 United States Census figures established the total population at 182,064 persons, of whom 62,152, or approximately 34 per cent, were black. Demographic data compiled in the Census Bureau's standardized community statistical tracts show that 3.3 per cent of the blacks live in census tracts which are zero to 14 per cent black; 6.7 per cent live in tracts

10. These data were collected from the deposition of Honorable J. Stanley Pottinger, Assist-ant Attorney General of the United States, Civil Rights Division.

which are from 15 to 49 percent black; none of the census tracts contains a black population concentration between 50 and 84 per cent, inclusive; and 90.0 per cent of Shreveport's black citizens live in census tracts composed of 85 per cent blacks, or more.

Plaintiffs' experts testified concerning the racial and socio-economic distribution of population in Shreveport and offered detailed exhibits in summary. Data gathered in increments of city blocks, again abstracted from the 1970 Census, and transposed upon a city map, illustrates that most blacks are concentrated in five non-contiguous, identifiable, geographical areas or "neighborhoods," the two largest of which are the Allendale and Mooretown sections of the city. Allendale runs westward from the edge of the downtown business district to the northeastern shore of Cross Lake, the city's reservoir, and encompasses the sizeable, black Lakeside subdivision. Mooretown surrounds the westerly end of Hollywood Avenue, a thoroughfare connecting the geographic center of the city with the Shreveport Regional Airport near the westernmost edge of town. Approximately 20,000 black persons are housed in each of these communities. Three smaller black concentrations are the Hollywood and Stoner Hill neighborhoods and the black area of Cedar Grove, which contains a sizeable, identifiable white community as well.

■ A special city-wide census was taken in 1974 for purposes of revenue sharing of funds collected under Louisiana's tobacco excise tax. Although information collated in that census was not introduced in evidence here, it was admitted in evidence in Civil Action No. 14,665, *Fain v. Caddo Parish Police Jury,* over which the undersigned judge presided. Consequently, we employ the "quite common" rule of law that we may take judicial notice of those figures as supplementary to those already in evidence.[11] By 1974, total city population had increased to 193,745 persons, while the number of black residents declined slightly to 61,984, or approximately 32 per cent.[12] Additionally, the boundaries of identifiable black concentrations have shifted somewhat since 1970. Queensborough, south of Lakeside, now is a racially mixed neighborhood, as is the formerly all-white Morningside area between Mooretown and Hollywood; and substantial numbers of blacks now reside in formerly white sections of the Cedar Grove neighborhood.

The concentration of blacks within readily definable geographic areas and the degree of delineation between black and white population clusters further was emphasized by a statistical summary in evidence of a study of housing patterns in 109 American cities having a population in excess of 50,000. Among cities studied, Shreveport exhibited the highest index of racial segregation in housing.[13] Moreover, in contrast to the national trend away from racially segregated housing patterns, including Southern cities, Shreveport's segregated housing index has risen with each

11. Wright & Miller, *Federal Practice and Procedure: Civil* § 2410.

12. We are informed by Public Management of Louisiana, Inc., the demographic firm responsible for the 1974 Special Census, that the slight decline in black population within Shreveport's city limits is due in some measure to a shift of blacks to the Cooper Road community, a cluster of over 11,000 black persons immediately northwest of Shreveport, beyond the city limits.

13. The 109 cities are all of the American cities in which data describing the white and black population of individual city blocks have been available for each United States Census from 1940 to 1970, inclusive, and which had a minimum of 1,000 nonwhite households in 1940.

The index ranges from 0 to 100. A score of 100 represents total racial segregation; that is, no city block of mixed racial composition. On the other hand, if every city block mirrored exactly the city-wide ratio of blacks to whites, the index value would be 0. The index value ascribed to a particular city represents the percentage of black population which would have to be shifted from blocks where the actual black population percentage exceeds the percentage of blacks in the city to blocks of black under-representation in order to achieve an index score of 0.

Shreveport's 1970 index score was 97.4, highest in the nation.

decennial collection of data by the Census Bureau.[14]

■ Homes in identifiable black neighborhoods generally are of much lower quality and value than those elsewhere in the city. Hundreds of household blocks consist of nothing but "shotgun" dwellings, typical of the architecture of black single-family homes, both urban and rural, in this part of the country. Relatively inexpensive, oil-base streets abound in the black communities, and during the hot, summer months huge buckles frequently develop as a result of heat expansion. Additionally, heavy rains often wash out large sections of the surface, leaving depressions, or "potholes," along the roadway. Testimony indicated that these occurrences, acting singly or in combination, occasionally render streets totally impassable.[15] Most streets in most all-black neighborhoods have inadequate drainage ditches which cannot handle heavy rainfall.

Perhaps the most striking evidence remaining as a substantial vestige of past official racial discrimination is the failure of local officials to respond to the employment needs of Shreveport's black citizens of working age. Shreveport now employs 2,337 persons of whom 26.8 per cent are black. 85.9 per cent of all black city employees earn less than the national poverty level of $6,000.00 per year, while only 18.7 per cent of the white workers draw similar incomes. 82.7 per cent of all black employees are classified as "service maintenance," the lowest job classification in the city's personnel plan; a mere 13.7 per cent of the white workers are so classified. In the income category from $10,000.00 to $12,-999.00 blacks comprise 1.9 per cent, 0.4 per cent are races other than white or black, and 97.7 per cent are white. All city personnel in the two top income categories are white. Since the turn of the century, no black person ever has been appointed to head any of the various city departments such as Fire, Police, or Recreation; nor has a black person ever been appointed as a city attorney, city physician, traffic engineer, superintendent of water and sewerage, superintendent of streets, or city engineer. Even the Department of Sanitation, employer of the greatest number of blacks among city departments, has a white superintendent. Only recently have blacks been appointed to some official committees under auspices of the City Council.

Against this backdrop of past official discrimination and official unresponsiveness to the physical and economic needs and desires of Shreveport's black populace, we now direct our attention to the politico-legal aspects of this case.

## II.

■ The underpinning of the modern reapportionment cases has been the "one person—one vote" objective. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). That decision held that in order to comport with the Equal Protection Clause, an apportionment plan or election scheme must insure that one person's vote equals that cast by another "as nearly as is

14. Shreveport's indices have been as follows: 90.3 in 1940; 93.2 in 1950; 95.9 in 1960; and 97.4 in 1970.

15. The law provides a paving lien procedure by which residents of any community may petition the city to have streets paved. Signatures of 60 per cent of the landowners fronting a particular street are required. The street then may be paved at city expense, and a paving lien is created upon each fronting lot to secure the obligation of the landowners to repay the expenses of paving. The city usually discounts the paving lien certificate to a financial institution which in turn collects payment in instalments. Additionally, recently enacted city ordinances prohibit construction of newly developed subdivisions without paved streets, with adequate drainage and sewage disposal facilities.

By discussing the deplorable condition of oil-base streets generally found in black communities, we do not suggest that the city pave all streets without expense to the abutting landowners. However, we judicially notice that oil-base streets which are located in some of Shreveport's more affluent neighborhoods are not permitted to lapse into such disrepair. Rather, the Department of Public Works promptly re-levels such streets in the event of heat buckling, wash-outs, or traffic wear and tear.

practicable." · *Id.,* at 577, 84 S.Ct. 1362; *Wesberry v. Sanders,* 376 U.S. 1, at 14, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). At-large elections plainly exhibit the mathematical ideal, for under such plans the weight of each person's vote equals exactly that of every other. However, judicial overview of fair representation cases does not cease with mere mathematical inquiry, for early on the Supreme Court recognized that, assuming substantial mathematical equality, nevertheless "it might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." *Fortson v. Dorsey,* 379 U.S. 433, at 439, 85 S.Ct. 498, at 501, 13 L.Ed.2d 401 (1965); *Burns v. Richardson,* 384 U.S. 73, at 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966).

We recognize at the outset that "it is axiomatic that at-large and multi-member districting schemes are not *per se* unconstitutional." *Zimmer v. McKeithen,* 485 F.2d 1297, at 1304 (5th Cir., 1973) *en banc,* and authorities there cited. Moreover, constitutional infirmity of an at-large or multi-member plan is not demonstrated solely by a showing that the identifiable minority group, contending that discrimination exists by dilution, has not been able to elect officeholders in the multi-member district in mathematical proportion to its potential voting strength. *White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. 2332; *Whitcomb v. Chavis, supra,* 403 U.S. at 149, 91 S.Ct. 1858; *Zimmer v. McKeithen, supra* at 1305. Rather, in order to prevail:

"... plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question— that its members had less opportunity than did others in the district to participate in the political process and to elect legislators of their choice. *Whitcomb v. Chavis, supra,* 403 U.S. at 149–150, 91 S.Ct. 1858, at 1872." *White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. at 2339.

In *White,* the Supreme Court affirmed the holding of a three-judge district court that the multi-member scheme of electing members of the Texas House of Representatives from Dallas and Bexar Counties invidiously diluted the voting strength of Negroes and Mexican-Americans, respectively, residing in identifiable inner-city areas. Recounting fact findings entered by the district court regarding Dallas County, the Court observed that: (1) Texas has a history of official racial discrimination, often "touch[ing]" the rights of Negroes to register on the voting rolls, cast their ballots, and otherwise participate in the political process; (2) Texas law provided for majority primaries, and a "place" rule limited candidates to a certain place on the ballot (in a footnote the Court referred to the conspicuous absence of a residency requirement, noting that all members of the Dallas County delegation to the Texas House could be elected from outside the identifiable minority area of the city); (3) only two black persons from Dallas County had been elected to the Texas House of Representatives since Reconstruction, and these were the only two blacks ever slated by the white-controlled Dallas Committee for Responsible Government (DCRG), a candidate slating organization without whose endorsement nomination and election were extremely difficult; and (4) the DCRG did not require the support of black voters; therefore, it could ignore the "political and other needs and aspirations" of blacks with impunity. *White v. Regester, supra* at 766–767, 93 S.Ct. at 2340. Similarly, after noting that Mexican-Americans likewise comprise an identifiable class of persons entitled to equal protection of the laws under the Fourteenth Amendment, the Court summarized the district court's findings in support of its conclusion that Mexican-American residents of San Antonio's "Barrio" district (a Mexican-American inner-city area) effectively were removed from the political processes of Bexar County. The chronicle of official discrimination suffered by Mexican-Americans was even more pervasive than that endured by blacks. State-im-

posed poll tax and restrictive voter registration procedures foreclosed political participation by Mexican-Americans throughout Texas, as a result of which voter registration of Mexican-Americans in Bexar County remained at a low level as late as 1972. Finally, the members of Bexar County's delegation to the Texas House were insensitive to the needs of Barrio residents. *White v. Regester, supra* at 767–769, 93 S.Ct. 2332.

Two recent Fifth Circuit decisions applying the rule of *White* give us insight into the controlling principles of law by which we today are guided: *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir., 1973) (*en banc*) aff'd *sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976); and *Wallace v. House,* 515 F.2d 619 (5th Cir., 1975), cert. granted, judgment vacated and remanded, 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976), both of which were tried to the undersigned judge in the District Court.

The issue on appeal in *Zimmer* was whether dilution existed where black persons commanded a majority of the population of rural East Carroll Parish, Louisiana, yet comprised slightly less than half of the registered voters; school board and police jury elections were conducted under an at-large plan imposed by court order.[16] A panel of the Fifth Circuit affirmed our ruling providing for at-large elections. 467

F.2d 1381 (5th Cir., 1972). After painstaking review of the record, the Court *en banc* reversed, finding that at-large elections created and would perpetuate an invidious dilution of black voting rights. The Court outlined pertinent issues to be addressed in deciding questions of dilution:

". . . where a minority can demonstrate a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case is made. Such proof is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts." *Zimmer v. McKeithen, supra* at 1305 (Footnotes omitted).

While noting that proof of dilution may rest upon a showing of an "aggregate" of these factors, the Court was careful to point out that "the Supreme Court's recent pronouncement in *White v. Regester, supra,* demonstrates . . . that all these factors need not be proved in order to obtain relief." *Zimmer v. McKeithen, supra* at 1305.[17]

---

**16.** *Zimmer* began as a quantitative reapportionment case.

Plaintiff, a white man, contended that ward lines then in effect (1968) created single-member districts of disparate population, thereby lessening the weight of each vote in the more populated wards. Following an evidentiary hearing, we declared that plan unconstitutional and approved an at-large apportionment scheme presented by the police jury. (Our approval of an at-large plan preceded the Supreme Court's decision in *Connor v. Johnson,* 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971), expressing preference for single-member districts in court fashioned—or approved—plans supplanting admittedly unconstitutional schemes.) We ordered the parties to file updated plans following the 1970 census. Stewart Marshall then sought leave to intervene in behalf of himself and others similarly situated, contending dilution of the black vote. After a

second evidentiary hearing in August of 1971, we adhered to our approval of the police jury's plan. In early 1972, following the Supreme Court's decision in *Connor v. Johnson, supra,* intervenor sought withdrawal of our order approving at-large elections and implementation of single-member districts. We agreed and entered an order accordingly. However, Marshall meanwhile had entered a notice of appeal from our order perpetuating the at-large plan; thus the panel opinion of the Fifth Circuit correctly noted that we were without jurisdiction to impose single-member districts.

**17.** The Supreme Court affirmed the judgment below in *Zimmer,* "but without approval of the constitutional views expressed by the Court of Appeals." *Sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Instead the Supreme Court rested its affirmance upon *Connor v. Johnson, supra.*

Factors found in *Zimmer* were (1) a protracted history of official racial discrimination fostering a dual school system, requiring literacy tests in order to qualify to vote, and at times forbidding blacks from registering at all; (2) majority voting requirements; (3) anti-single shot voting provisions; (4) racial bloc voting. The aggregate of these findings compelled the conclusion that as the result of at-large elections blacks effectively were being excluded from the political process.

In *Wallace,* we found that at-large election of all aldermen in the small town of Ferriday, Louisiana (population approximately 5,000), within the factual framework there presented, operated to dilute the voting power of the town's black electors. Summarizing the evidence adduced at trial, the appellate Court recited:

". . . with one recent and fortuitous exception, no black has ever been elected to municipal office in Ferriday. They showed that, in this thoroughly Democratic town (there are only 85 registered Republicans in the entire parish), no black man or woman has ever been selected to run as a candidate of the Democratic Party. Plaintiffs then chronicled the all-too-familiar story of racial segregation and other racial discrimination in every facet of local public life, including public education and public employment, which discrimination is abating only now. With respect to the distribution and quality of municipal services, the district court found that the streets and sidewalks, sewers and public recreational facilities provided by the Town for its black citizens are clearly inferior to those which

it provides for its white citizens. In all these years, the Ferriday Board of Aldermen has failed miserably in its responsibilities to its many black constituents." *Wallace v. House, supra* at 623. (Footnotes omitted.)

The Court further pointed to the prior prohibition against black voter registration, majority primary requirements, and racial voting polarization. Again the confluence of factors plainly illustrated that at-large elections were depriving black persons of meaningful participation in election processes.[18]

■ Illumination of the principles here involved, as afforded by *Zimmer* and *Wallace,* lies not so much in their factual content as in their judicial method. Each represents a thoughtful, exhaustive analysis of the evidence in the record, "paying close attention to the facts of the particular situations at hand," *Wallace v. House, supra* at 631, to discern whether the identifiable minority has suffered dilution depriving it of that meaningful access to the political process guaranteed by the Equal Protection Clause of the Fourteenth Amendment. The Court reminds us in each case that plaintiffs' burden of proof is borne by a *prima facie* showing of an aggregate of the factors sketched in *White.* Thus our task is not to comb the record seeking the presence or absence of any particular fact or set of facts, for none alone is dispositive of the question before us. Instead, our considered opinion must "represent . . . a blend of history and an intensely local appraisal of the design and impact of the Bexar County multi-member district [under scrutiny] in light of past and present reality,

---

Counsel for defendants are quick to point out that the constitutional views expressed by the Fifth Circuit thus are *dicta*. While this argument unquestionably is legally correct, we may not ignore the fact that those views represent the collective thoughts of the Court *en banc*.

Moreover, our decision today does not stand or fall upon the constitutional principles expressed in *Zimmer,* but rather upon those announced in *White v. Regester, supra,* and authorities there cited.

Finally, we note that the Fifth Circuit recently reaffirmed the constitutional principles of *Zimmer* in *Nevett v. Sides,* 533 F.2d 1361 (5th Cir., 1976).

18. The Court of Appeals, however, permitted the retention of one at-large seat on the Board of Aldermen. Again citing *Connor v. Johnson, supra,* the Supreme Court vacated and remanded, presumably to the end that an all single-member district plan be adopted. *Wallace v. House,* 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976).

political and otherwise." *White v. Regester, supra,* 412 U.S. at 769–770, 93 S.Ct. at 2341.

Thus we summarize the evidence before us in light of the established legal precedents:

A. *Lack of Openness of the Political Process.* Shreveport does not have slating organizations of the sort present in *White.* Any citizen of lawful age may qualify and seek election to city office, and in that sense the process is "open." However, as we have seen, our duty is to look beneath this facial neutrality to determine whether the paths "leading to nomination *and election* [are] . . . equally open to participation by the group in question." *White v. Regester, supra* at 766, 93 S.Ct. at 2339 (emphasis supplied). A strong indication that local political processes are not equally open is the fact that no black person ever has been elected to city office in Shreveport, notwithstanding black population levels in excess of thirty per cent. *Turner v. McKeithen,* 490 F.2d 191, at 195 (5th Cir., 1973); *Yelverton v. Driggers,* 370 F.Supp. 612, at 616 (M.D.Ala., 1974); *Pitts v. Busbee,* 395 F.Supp. 35, at 38 (N.D.Ga., 1975).[19]

Evidence strongly supports defendants' argument that the support of Shreveport's black voters actively is sought by all candidates in city elections. Indeed, we judicially notice that fact as true. Comprising, as they do, a sizeable constituency, blacks clearly have influence—sometimes decisive—at the polls. The record indicates that they may have provided the "swing" votes in a recent race for Commissioner of Public Safety. However, under majority vote requirements, "place" provisions, and the absence of a residency requirement, blacks appear to be condemned to submergence in the local multi-member political

sphere for the foreseeable future. Where black voters have provided the margin of victory, their effect has been only to tip the balance in favor of either of two white candidates.

We do not view this, however, as the sort of meaningful access to political processes intended by the Fourteenth Amendment as interpreted in *White, supra.*

B. *History of Racial Discrimination.* We have detailed the official racial discrimination and unresponsiveness which long have affected all aspects of the lives of Shreveport's black citizens. Only recently have we seen removal of the legal obstacles strewn in the path of Negro voters to the polls. Housing in the city remains almost totally segregated,[20] and residual effects of past discrimination linger in public employment. Black voter registration percentages remain lower than proportionate white registration. *White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. 2332; *Turner v. McKeithen, supra* at 195; *Zimmer v. McKeithen, supra* at 1306.

C. *State Policy Underlying Use of the Multi-member District.* At-large voting for members of the City Council has been the rule in Shreveport since 1910. Because blacks were disenfranchised at that time, we perceive no "tenuous policy" underlying the use of at-large voting in the city. See: *Wallace v. House, supra* at 633; *Cf. Id.,* at 631; *Zimmer v. McKeithen, supra* at 1307.

D. *Responsiveness to the Black Community.* In the past, local officials clearly neglected their responsibilities to the needs of black persons in the community. Recreational facilities were completely segregated, and those in black neighborhoods inevitably were inferior. Blacks were not appointed to committees and boards of local

**19.** *Pitts* involved the question of dilution where all members of the Fulton County Commission (Georgia) were elected at-large. Although black population levels had ranged from 30.7 to 39.3 per cent, no black ever had been elected to the Commission. The Court noted that in Bexar County, Texas, under scrutiny in *White,* at least some members of the minority population had been elected to the Texas House, and there the minority's percentage was approximately 29 per cent of the county's populace.

**20.** Although Shreveport has had an official Housing Authority for many years, its performance in providing low-rent housing for low-income persons—especially blacks—has been minimal.

importance, and the record of black employment by the city was, and still is, shameful. Finally, governmental services and facilities generally were disproportionately poor in the black neighborhoods.

Defendants argue that their now evidenced willingness to meet with members of the black community and work together to solve problems facing blacks particularly negates discrimination. We applaud the "open door" policy now exhibited by city officials and they are to be commended highly for having adopted it. Amid racial friction and priority disputes which necessarily accompany limited budgets, we now see at least some sincere efforts to achieve racial fairness in dispensing public benefits. Yet the record, in clarion tones, bespeaks many still lingering failures remaining to be rectified. The present political scheme of things has not, and will not, guarantee the black minority any more than peripheral participation in the solution.

E. *Enhancing Factors.* The majority primary law, "place" requirements, absence of residency requirements, and racially polarized voting all have exacerbated the past almost total foreclosure of blacks from truly effective exercise of the ballot.

▆▆▆ Assaying these facts and related circumstances peculiar to Shreveport, we must conclude that those portions of §§ 3.01 and 3.02 of the City Charter, which require *only* that the various Commissioners be residents of the city—from no particular neighborhood, district or section—and by common consent and practice during the twenty-six years since the Charter's adoption all elected Commissioners have run at-large, operate impermissibly to dilute the voting power of the city's black electors in violation of the Equal Protection

Clause of the Fourteenth Amendment. Black voters as a class are deprived of the opportunity meaningfully to "participate in the political processes and to elect legislators of their choice." *White v. Regester, supra,* 412 U.S. at 766, 93 S.Ct. at 2339. Accordingly, we find those provisions unconstitutional.[21] Of course, as Chief Executive Officer of the City, necessarily the Mayor must be elected by voters in an at-large election city-wide.

Defendants' reliance upon certain language in *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), is misplaced.[22] There the Supreme Court was called upon to pass upon the constitutionality of the at-large scheme of electing state assemblymen and senators from Marion County, Indiana (principally, the City of Indianapolis). Black plaintiffs challenged the plan, contending that the number of black representatives elected thereunder was disproportionately low when measured against the percentage of black voters in the county. In reversing the District Court's finding of dilution, the Supreme Court noted that "the voting power of [blacks] may have been 'cancelled out' as the District Court held, but this seems a mere euphemism for political defeat at the polls." *Id.,* at 153, 91 S.Ct. at 1874.[23] The Court noted that disproportionate representation of the minority was not sufficient to prove dilution absent evidence that blacks:

" . . . had less opportunity than did other [citizens] to participate in the political processes and to elect legislators of their choice. We have discovered nothing in the record . . . indicating that [blacks] were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on

---

21. Since we find that portions of §§ 3.01 and 3.02 violate the Equal Protection Clause of the Fourteenth Amendment and in those respects are unconstitutional, it is unnecessary that we address plaintiffs' contention that at-large elections in Shreveport also violate the Fifteenth Amendment.

22. In their brief in surrebuttal, defendants quote at length from *Whitcomb v. Chavis, supra* at 156, 91 S.Ct. 1858, *et seq.*

23. Evidence showed that the majority of Marion County's voters cast their ballots for white, Republican candidates. Thus Democratic legislators, both black and white, were less frequently elected.

those occasions when legislative candidates were chosen. Nor did the evidence . . . show . . . that [blacks] were regularly excluded from the slates of both major parties, thus denying them the chance of occupying legislative seats." *Id.,* 149–150, 91 S.Ct. 1872.

Instead, the Court found that black candidates regularly were slated by both political parties, and frequently were elected.[24] Moreover, the Court pointed to evidence that elected representatives, both black and white, "avowed a substantial commitment to the substantive interests of black people." *Id.,* at 150 n. 30, 91 S.Ct. at 1872. These findings discount any factual comparison which may be drawn between *Whitcomb* and the present action.[25]

### III.

In fashioning a remedy for the constitutionally unacceptable situation described above, we note initially that the prayer of plaintiffs' complaint, seeking apportionment of Shreveport into five single-member districts from which the Mayor and Commissioners would be elected, itself would be unconstitutional if literally granted. For example, a Commissioner of Public Safety, having responsibility for all police and fire protection of citizens throughout the city, could not be elected from any particular geographic area and thus be totally unresponsible electorally to the entire remainder of the city's population. Election from particular geographic districts within the city of the Mayor or any Commissioner, each of whom is vested by the City Charter with specific city-wide executive and administrative responsibilities and duties for management of particular departments of government, would not comport with the "one-person one-vote" command of the Fourteenth Amendment. *Reynolds v. Sims, supra.*

It is not our duty to define or order specific alterations to the City Charter. These are true political matters which must be adopted by the electorate of the city as a whole, after much careful study. It is well known that forms of municipal government other than the commission council type are in wide use and are working well elsewhere. All we may hold, at this juncture, is as set forth above.

Recognizing that adequate time is most necessary to formulate whatever type of government is to be submitted to Shreveport's electorate, perhaps in the form of alternative choices, we hereby order defendants, within one year from this date, to submit proposed revisions to the City Charter so as to bring it into compliance with the constitutional principles we have articulated. Of course, responsible civic groups also may wish to propose such changes, and they may do so, after leave being granted them to intervene herein, through counsel. Upon receipt of formally filed plans with the Clerk of this Court, we shall order a remedial hearing. The matter of possible assessment of Court costs, attorneys fees, and the like shall await our final rulings herein.

---

**24.** Shreveport's small, but viable, Republican Party organization never has fielded a black candidate for city office, nor has the Democratic Party as such.

**25.** Defendants also orally have urged upon us the yet unpublished opinion of the District Court on remand in *Nevett v. Sides, supra.* Again their reliance is misplaced, for the facts there presented differ markedly from those in the record before us. See: *Nevett v. Sides, supra* at n. 3.