BLACKS UNITED FOR LASTING
LEADERSHIP, INC., et al.,
Plaintiffs-Appellees,

v.

The CITY OF SHREVEPORT et al.,
Defendants-Appellants,

Louisiana Municipal Association,
Intervenor.

No. 76–3619.

United States Court of Appeals,
Fifth Circuit.

March 29, 1978.

John Gallagher, George C. (Neil) Dixon, Asst. City Atty., Shreveport, La., for City of Shreveport, Allen, Burton and Hathaway.

Charles C. Grubb, Shreveport, La., William J. Guste, Jr., Atty. Gen., Baton Rouge, La., A. Mills McCawley, Asst. Atty. Gen., Shreveport, La., for Edwards and Martin.

Charles E. Williams, III, NAACP Legal Defense Fund, Jack Greenberg, New York City, Hilry Huckaby, III, Shreveport, La., Eric Schnapper, New York City, for plaintiffs-appellees.

R. Gordon Kean, Jr., Baton Rouge, La., for other interested parties.

Dennis J. Dimsey, Brian K. Landsberg, Walter W. Barnett, Miriam R. Eisenstein, Attys., Drew S. Days, III, Asst. Atty. Gen., Appellate Section, Civil Rights Div., Dept. of Justice, Washington, D. C., for amicus curiae, U. S. A.

Before WISDOM, SIMPSON and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This is the third of four consolidated voting dilution cases we decide today. *See Nevett v. Sides (Nevett II)*, 571 F.2d 209, 213 n. 1 (5th Cir. 1978). Black citizens of Shreveport, Louisiana, and organizations representing their interests brought this class action to strike down the at-large system for electing the city commissioners of Shreveport. The black citizens, who in 1974 constituted thirty-two percent of the voting population, alleged that the at-large feature operated unconstitutionally to dilute their votes. The district court agreed and declared the commission plan unconstitutional under the fourteenth amendment to the Constitution. *Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 71 F.R.D. 623, 636 (W.D.La.1976). The district court, however, did not order the implementation of a plan incorporating single-member districts. Rather, the court ordered the city and other defendants to formulate a constitutional plan within one year from the date of the judgment, July 16, 1976. The defendants bring this appeal, urging that the district court erred in declaring the commission plan unconstitutional and in ordering the submission of a new plan. Because the district court failed to undertake properly the factual inquiry mandated by our opinion of today in *Nevett II*,[1] we must remand this case for further proceedings.

I

A five-member commission governs the City of Shreveport. All the commissioners are elected at-large in contests for numbered positions corresponding to specific municipal departments of city-wide responsibility.[2] These features of Shreveport's electoral system derive from a state enactment of 1910 that authorized the organization of municipalities under commission

---

1. This is the opinion of the second appeal in *Nevett v. Sides*, which we denominate *Nevett II*. The first appeal, *Nevett v. Sides (Nevett I)*, 533 F.2d 1361 (5th Cir. 1976), reversed a judgment for black plaintiffs alleging dilution of their votes by an at-large municipal plan and remanded the case to the district court. On remand the court held the at-large scheme to be constitutional. In the second appeal, we discussed and analyzed the legal principles applicable to voting dilution cases and concluded that the district court's judgment for the defendants should be affirmed. We incorporate this discussion in this case, with special emphasis on Parts I and II of *Nevett II*.

2. These commission designations and their respective departmental responsibilities are as follows: Mayor, Department of Public Affairs; Commissioner of Public Safety, Departments of Police and Fire; Commissioner of Public Works, Departments of Streets and Sanitation; Commissioner of Public Utilities, Departments of Water and Sewerage; and Commissioner of Finance, Department of Finance. See the district court's opinion, 71 F.R.D. at 627.

government. 1910 La. Acts No. 302. In that year, Shreveport adopted an at-large plan substantially resembling the one presently in force. In 1948, the state legislature proposed an amendment to article 14, section 37 of the 1921 Louisiana Constitution. That amendment authorized the City of Shreveport to establish by referendum a home-rule charter. 1948 La. Acts No. 529. The proposed amendment was adopted by statewide referendum in 1948, and electors in Shreveport voted to adopt a local charter in 1950. The charter government that eventuated is the subject of this action.

Under state law, municipal elections are subject to a majority vote requirement, La. Rev.Stat.Ann. § 18:358 (West 1969), but there are no party primaries. Commission candidates are not required to reside in subdistricts; they need only live within the city limits.

## II

The issue in this appeal is the adequacy of the district court's findings of fact. In cases tried without a jury, Fed.R.Civ.P. 52(a) requires the district court to "find the facts specially and state separately its conclusions of law thereon." What the rule means is that "[f]indings of fact must be made in sufficient detail and exactness 'to indicate the factual basis for the ultimate conclusion' reached by the court." *S.S. Silberblatt, Inc. v. United States*, 353 F.2d 545, 549 (5th Cir. 1965) (quoting *Kelley v. Everglades Drainage District*, 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943)) (footnote omitted). We conclude that the district court did not make the required findings in this case.

We have discussed fully the precepts of voting dilution in our opinion of today in *Nevett II*. See note 1 *supra*. To reiterate briefly, in *Nevett II* we read *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d

296 (1976), as establishing a multifactor circumstantial evidence test for dilution. In *Zimmer*, the en banc court synthesized the dilution principles of two Supreme Court opinions, *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). In *Regester*, the Court upheld a finding of dilution by a three-judge district court. The district court had relied upon certain circumstantial evidence that led it to conclude that the scheme was unconstitutional. This evidence included findings of past official discrimination that impinged upon the right of blacks to register, vote, and "participate in the democratic processes," and of certain electoral devices that "enhanced the opportunity for racial discrimination." [3] 412 U.S. at 766, 93 S.Ct. at 2340. Additionally, and "[m]ore fundamentally," party nominating procedures worked unfairly to exclude blacks from the slating process. *Id.* at 766–67, 93 S.Ct. 2332.

On the other hand, in *Chavis* the Court reversed a judgment of a three-judge district court that had found certain multi-member state legislative districts in Indiana unconstitutional. The Court found that blacks had enjoyed an equal opportunity "to participate in the political processes and to elect legislators of their choice." 403 U.S. at 149, 91 S.Ct. at 1872. Nothing in the record had shown that blacks had been discouraged from registering, voting, choosing a political party, or participating in the slating of candidates. Of particular significance to the Court, the district court had made no finding indicating a lack of responsiveness on the part of the at-large representatives to the interests of blacks. 403 U.S. at 155, 91 S.Ct. 1858.

■ The en banc court in *Zimmer* synthesized the dilution principles of *Regester* and *Chavis* by establishing certain criteria that a district court must address in deciding a dilution case. Essentially, *Zimmer* drew its criteria from the facts considered

---

**3.** These devices included the requirements that candidates run for numbered positions, that candidates win by majority vote in primary elections, and that candidates need not reside in subdistricts. 412 U.S. at 766, 93 S.Ct. 2332.

significant by the Supreme Court in *Regester* and *Chavis*. Certain facts were seen to go primarily to the ultimate issue of dilution. They included a lack of access to candidate slating processes, the unresponsiveness of representatives to the needs of blacks, the presence of a tenuous state policy in favor of at-large districting, and the existence of past discrimination that precludes effective participation by blacks in the electoral system. *Zimmer*, 485 F.2d at 1305. Additional factors were considered enhancive of an indication of dilution under the primary criteria. These enhancing factors included the existence of a large district, a majority vote requirement, anti-single shot voting provisions, and the absence of subdistrict residency requirements. We have interpreted the en banc court's reliance upon these indicia as establishing categories of factual inquiry. *Nevett II*, 571 F.2d at 223. The criteria are designed to elicit circumstantial evidence of intentional dilution. *Id.*

It is the obligation of the district court to make specific factual findings under each of the criteria. The court should next determine whether the aggregate of the evidence preponderates in favor of a finding of dilution. *See id.* at 224; *Zimmer*, 485 F.2d at 1305. As we said recently in *David v. Garrison*, 553 F.2d 923, 930 (5th Cir. 1977), "[a] full weighing and balancing of all of [the criteria] is called for so that a decision based on the aggregate of the factors may be made." This the district court failed to do.

Before we examine in detail what the district court did in this case and set forth what it should do on remand, we feel constrained to clear up what appears to be a misunderstanding on the part of the district court concerning the precedential value of *Zimmer*. The Supreme Court affirmed *Zimmer*, "but without approval of the constitutional views expressed by the Court of Appeals." *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 638, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296 (1976) (footnote omitted). The appellants contend, as they did in the proceedings below,

that by this language the Court intended to overturn the analysis that led the en banc court to its determination of unconstitutionality. This contention has support in neither logic nor law. Obviously, "without approval" is not equivalent to "disapproval." The language of the Court, on its face, intimates neither approval nor disapproval. The rationale of *Marshall* reaffirms this interpretation, since the disposition of the case was on remedial grounds.

Initially, *Zimmer* was a quantitative reapportionment case. *See also Nevett II*, 571 F.2d at 215. The plaintiff, Zimmer, was a white resident of East Carroll Parish, and he brought suit alleging that population inequalities among the wards in the parish operated to violate the one person, one vote principle in elections for police jury and school board. The district court found the apportionment unconstitutional and ordered the establishment of at-large plans for elections for both bodies. Elections under this plan were held in 1969 and 1970. After the completion of the 1970 census, the district court, which had retained jurisdiction of the case, ordered the police jury and school board to submit plans taking into account population changes. The bodies resubmitted the at-large plan. Marshall, a black, intervened on behalf of black voters in the parish and asserted that the plan diluted black votes. The district court reapproved the plan, and Marshall appealed. On appeal, a panel of this court affirmed, but the court sitting en banc reversed and held the plan unconstitutionally diluent of the black vote.

The Supreme Court granted certiorari and properly viewed the case not as one of unconstitutional dilution but rather as one based upon the propriety of the district court's remedy in a one person, one vote case. The remedial issue was resolved under the Court's supervisory powers and not on constitutional grounds. This holding was in line with several of the Court's opinions that had admonished the district courts to avoid the use of at-large seats in fashioning their remedial plans. *E. g., Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d

766 (1975); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). This disposition of the case rendered unnecessary a discussion of the constitutional analysis of the en banc court. Indeed, it was the deference the Court paid the traditional rule that federal courts should avoid disposition on constitutional grounds if another adequate basis is available that led it to affirm "without approval of the constitutional views expressed by the Court of Appeals."[4] *See also Bolden v. City of Mobile*, 571 F.2d 238, 242 n. 3 (5th Cir. 1978).

It is clear, therefore, that the Court in *Marshall* expressed no view whatsoever as to the propriety of the constitutional analysis in *Zimmer*. Thus, that analysis continues to be of controlling precedence in this circuit. We have so stated on several occasions. *Hendrix v. Joseph*, 559 F.2d 1265, 1268 (5th Cir. 1977); *David v. Garrison*, 553 F.2d 923, 928 (5th Cir. 1977); *Nevett v. Sides (Nevett I)*, 533 F.2d 1361 (5th Cir. 1976); *Paige v. Gray*, 538 F.2d 1108, 1110–11 n. 4 (5th Cir. 1976); *McGill v. Gadsden County Commission*, 535 F.2d 277, 280 n.6 (5th Cir. 1976). The district court in this case, however, expressed some reluctance to rest its decision upon the analysis in *Zimmer*. The court's opinion contained the following disclaimer:

> Counsel for defendants are quick to point out that the constitutional views expressed by the Fifth Circuit [in *Zimmer*] are *dicta* [because of the language in the Supreme Court's affirmance]. While this argument unquestionably is legally correct, we may not ignore the fact that those views represent the collective thoughts of the Court *en banc*.

Moreover, our decision today does not stand or fall upon the constitutional principles expressed in *Zimmer*, but rather upon those announced in *White v. Regester, supra*, and authorities there cited. 71 F.R.D. at 633–34 n. 17.

With all deference to the difficult task facing a district judge in this complex area of the law, we think that the court below misunderstood the teaching of *Zimmer*. As our opinion in *Nevett II* explains, the inquiry under the *Zimmer* criteria and the weighing of the evidence are essentially the same analyses a finder of fact undertakes in any circumstantial evidence case. 571 F.2d at 224 n. 22. "The process does not differ from that of inferring ultimate facts from basic facts in other areas of the law. It is grounded in an experiential, intuitive assessment of the likelihood that the [districting] decision was designed to further one or another objective." Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Sup.Ct.Rev. 95, 121.

The ultimate fact to be proved is unconstitutional dilution, as defined in *Regester* and *Chavis*, to wit,

> that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*Regester*, 412 U.S. at 766, 93 S.Ct. at 2339 (citing *Chavis*, 403 U.S. at 149–50, 91 S.Ct. 1858). The *Zimmer* criteria are merely sub-issues that indicate points of factual inquiry that are relevant to this ultimate issue. *Zimmer* does not alter the constitutional principles of voting dilution, it mere-

---

4. The Court cited the celebrated concurrence of Justice Brandeis in *Ashwander v. TVA*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), to support the quoted statement. In his concurrence, Justice Brandeis enumerated "a series of rules under which [the Court] has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." *Id.* at 346, 56 S.Ct. at 482. Among these rules is the following: "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Id.* at 347, 56 S.Ct. at 483. The reliance of the Court in *Marshall* upon the concurring opinion in *Ashwander* leaves no doubt that the Court intended not to express any view on the constitutional issues addressed by the en banc court in *Zimmer*.

ly tells a plaintiff how to make out a case. Therefore, the constitutional precepts of *Zimmer* are congruent with those of *Regester* and *Chavis,* and it follows that a finding of dilution under *Zimmer* is a finding of dilution under *Regester* and *Chavis.* The converse is also true. Consequently, the district court could not base its holding on *Regester* but not on *Zimmer.* Notwithstanding the reluctance of the court to rest its holding on *Zimmer,* the court did perform a perfunctory examination under each criteria. We now turn to the findings below.

### III

The district court made the following findings under the criteria cited in *Zimmer* as primary indicators of dilution. The court found a lack of openness of the political processes in Shreveport. This conclusion appears to rest primarily upon the failure of blacks to achieve office. 71 F.R.D. at 635. In fact, only one black had sought election to the city council. He was soundly defeated. The court seemed to attribute the reluctance of blacks to seek office to the "inevitability of defeat" under the at-large system. *Id.* at 628. The other evidence cited by the court under this criterion seemed to weigh against its finding. The slating process was found to be open. "Any citizen of lawful age may qualify and seek election to city office, and in that sense the process is 'open.'" *Id.* at 635. Moreover, the evidence was seen to "strongly [support] defendants' argument that the support of Shreveport's black voters actively is sought by all candidates in city elections." *Id.* It was found that "[b]lacks clearly have influence—sometimes decisive—at the polls." *Id.* The court, however, saw influence of this type to be constitutionally insufficient. "We do not view this, however, as the sort of meaningful access to political processes intended by the Fourteenth Amendment as interpreted in *White [v. Regester], supra."* *Id.*

These conclusory findings have insufficient factual underpinnings. The court must examine all the relevant aspects of participation in the political processes to determine whether access has been denied. Although the failure of blacks to achieve or seek office merely because of the likelihood of defeat may tend to indicate a lack of access to political processes, *Bolden v. City of Mobile,* 571 F.2d 238 at 243, standing alone it is insufficient to support an inference that the processes are not open. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *McGill v. Gadsden County Commission,* 535 F.2d 277 (5th Cir. 1976); *Bradas v. Rapides Parish Police Jury,* 508 F.2d 1109 (5th Cir. 1975); *Robinson v. Commissioners Court,* 505 F.2d 674 (5th Cir. 1974). The only finding below that might conjoin with the poor election record of blacks to support the court's conclusion is the existence of past discrimination in the registration processes. 71 F.R.D. at 629. The issue, however, is whether the past denial has present invidious effect.[5] *McGill v. Gadsden County Commission,* 535 F.2d at 281. The opinion below is devoid of any such finding. We cannot second-guess what additional evidence the court might have entertained in reaching its conclusion. The court must make specific findings. *See Hendrix v. Joseph,* 559 F.2d 1265, 1268 (5th Cir. 1977); *cf. Kirksey v. Board of Supervisors,* 554 F.2d 139, 145 & n. 13 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).

The second primary criterion addressed by the court is the issue of past discrimination. The court listed a number of facts that did demonstrate the existence of past discrimination. As we have noted, the court found discrimination in the registration processes that existed until the enforcement of the Voting Rights Act of 1965,

---

**5.** The court did note that blacks register in proportionately fewer numbers than whites. 71 F.R.D. at 635. But this discrepancy, even when coupled with a finding of past discrimination, "cannot . . ., in [itself], cause an at-large voting scheme to unconstitutionally deny black access to the political process." *McGill v. Gadsden County Commission,* 535 F.2d 277, 281 (5th Cir. 1976).

pursuant to which federal registrars were ordered to Shreveport. 71 F.R.D. at 629. The court took judicial notice of *de jure* segregation in schools, public accommodations, recreational facilities, and public facilities. *Id.* Housing patterns were shown to be segregated, and homes were found to be of lower quality and value in black neighborhoods. *Id.* at 630–31. It was found that the city employed markedly fewer blacks than whites in the upper levels of city service, *id.* at 631, and that until recently, blacks had not been appointed to committees under the responsibility of the city council. *Id.*

■ The court's treatment of this criterion is similar to that of the district court in *David v. Garrison*, 553 F.2d 923 (5th Cir. 1977). The district court had made findings of past discrimination, "[h]owever there were no findings that, because of the past discrimination, present black participation in elections is less than effective." *Id.* at 930. Moreover, "[t]here were no findings that blacks were afraid to vote, or campaign . . . ." *Id.* These observations are apposite with equal force to the findings of the district court in this case. Although plaintiffs need not establish by direct proof a causal relationship between the effects of past discrimination and the denial of access to political participation, *Kirksey v. Board of Supervisors*, 554 F.2d 139, 145 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977), the district court must make a specific finding to that effect. The court failed to do so in this case.

■ On the issue of the weight of the state policy behind at-large districting, the court made no discernable finding. The court said only, "Because blacks were disenfranchised [at the time of the passage of the districting act] we perceive no 'tenuous policy' underlying the use of at-large voting in the city." 71 F.R.D. at 635. We are at a loss to perceive what the court meant. The gravamen of the state policy issue is whether a sufficient state interest in at-large districting exists to negate the inference that the plan was enacted or is being main-

tained for discriminatory purposes. *Nevett II*, 571 F.2d at 224. Perhaps the court is equating a lack of discriminatory intent in the enactment of the districting statute with the existence of a strong state policy in favor of such districting. If so, the finding is incomplete because it has not addressed the issue whether an extant state policy justifies the maintenance of the plan. *See id.* In any event, more specific findings are required.

■ Under the final primary criterion, the court below indicated that the council has been unresponsive to the black community. This finding seems to rest primarily upon the already noted existence of past discrimination in the provision of recreational facilities and public services. 71 F.R.D. at 635–36. The only existing indicia of unresponsiveness found were the underrepresentation of blacks in city employment, *id.*, and some apparent discrepancy in the upkeep of streets and drainage ditches. *Id.* at 631. On the other hand, the court noted the " 'open door' policy now exhibited by city officials" and saw "at least some sincere efforts to achieve racial fairness in dispensing public benefits." *Id.* at 636. The issue of responsiveness in a case like this is momentous. Its resolution has considerable probative force on the question whether the plan is being purposefully maintained. As we said in *Nevett II*, "if representatives are unresponsive to the needs of a racial group apparently because some stages of the electoral process diminish the group's input, the inference that the processes are maintained with the purpose of discriminate can fairly be drawn." 571 F.2d at 223 n. 19. We think that additional, specific findings are necessary to support such a weighty conclusion.

As to the effect of the enhancing factors, the court had only the following to say: "The majority primary law, 'place' requirements, absence of residency requirements, and racially polarized voting all have exacerbated the past almost total foreclosure of blacks from truly effective exercise of the ballot." 71 F.R.D. at 636. We will not belabor these findings. They have rele-

vance only as they relate to findings under the primary criteria, which the court below has yet sufficiently to determine.

## IV

We take this opportunity to offer a few additional words of guidance to the district court as to how it should proceed in this case on remand. The court "need not indulge in exegetics, or parse or declaim every fact and each nuance and hypothesis," *Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 516 (5th Cir. 1969), but the "findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied." *Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc.,* 520 F.2d 1030, 1034 (5th Cir. 1975). This language has no greater relevance than in dilution cases, founded as they are upon "an intensely local appraisal of the design and impact of the [at-large] district in the light of past and present reality, political and otherwise." *White v. Regester,* 412 U.S. 755, 769–70, 93 S.Ct. 2332, 2341, 37 L.Ed.2d 314 (1973). The district court must make a finding under each *Zimmer* criterion.[6] Once the determination under each of the criteria has been made, the court must consider them together, giving the significance of each criterion and the strength of the showing under it due weight. This is what we meant when we instructed the district courts to decide dilu-

tion cases by determining whether "the aggregate" of the evidence under the criteria points to dilution.[7] *Zimmer,* 435 F.2d at 1305.

We have found that the district court has not complied with the mandate of Fed.R. Civ.P. 52(a) and *Zimmer* and its progeny to state its findings with sufficient specificity. Therefore, we REMAND for the purpose of enabling the district court to make appropriate findings. To avoid unnecessary delay in the ultimate review of this case, however, we retain jurisdiction and direct that the district court, within sixty days of the receipt of the mandate, make these findings, whereupon the parties shall make them a part of the record in this appeal.

REMANDED.

WISDOM, Circuit Judge, dissenting.

I respectfully dissent.

With deference, I submit that the majority's decision in this case illustrates what is wrong with *Nevett II.* When there is no need for close weighing of diverse and conflicting criteria, because of the obvious effects of at-large voting in a multimember voting district, there is no need to genuflect to *Zimmer* and go through the formalistic ritual required by *Nevett II.*

Shreveport has a population of 182,000. Thirty-four percent are black; the percentage of registered black voters is smaller.[1]

---

**6.** It may be that not all of the specific inquiries enumerated in *Zimmer* are relevant to the case under consideration. For example, it may be that the "particular functions" of the governmental body whose districting is being challenged "do not easily lend themselves to unresponsive representation." *Zimmer,* 485 F.2d at 1306 n. 26 (police juries). In such circumstances the district court must base its findings on analogous considerations or merely on the remaining criteria.

**7.** If, in the aggregate, the evidence is inconclusive or the criteria "don't really help," as in the district's court's initial opinion in *Nevett II, see id.,* 571 F.2d at 214–215, "then plaintiffs have not met their burden, and their cause must fail." *Nevett v. Sides (Nevett I),* 533 F.2d 1361, 1365 (5th Cir. 1976).

**1.** According to *Nevett II,* Fairfield has a black population of 48 percent, but more than 50 percent of the registered voters are blacks, allegedly because of the recent added registration of blacks by federal registers. If this is true, Fairfield must be the only community in the entire South where the percentage of registered eligible black voters exceeds the percentage of eligible white voters. This is not the place for a discussion of the reasons for the relatively lower proportion of blacks registering to vote. I make the point, because the almost even division of black and white voters in Fairfield should call for a more careful consideration of all relevant factors than in Shreveport. In this case the district court has made a finding that there was polarization of the races resulting in bloc voting. The disparity in numbers between

It does not take a late model computer to tell us that in Shreveport no black has a chance to be elected to a city office when the officials are elected at large. Each of the five City Commissioners is head of a separate department, accentuating polarization and the effect of at-large voting. The only access a black voter has to the political process is to vote for a black candidate in the primary and in the run-off cast a worthless vote for that candidate or vote for one of two white candidates.

I have no trouble understanding the district judge's statement, "Because blacks were disenfranchised [at the time of the passage of the districting act] we perceive no 'tenuous policy' underlying the use of at-large voting in the city". The Court knew that the act was adopted and at-large voting instituted in 1910, when there was no possibility of imputing a racially discriminatory policy to the State or to the City of Shreveport—for no blacks voted in Louisiana. But, even before Nevett II and Kirksey were decided the district judge found that the inevitable effect of maintaining at-large voting for multi-members is to dilute the black vote in Shreveport. The district court specifically addressed the issue. After considering all of the facts, population statistics, past and present evidence of discrimination, the court held, 71 F.R.D. at 636:

> "Assaying these facts and related circumstances peculiar to Shreveport, we must conclude that those portions of §§ 3.01 and 3.02 of the City Charter, which require only that the various Commissioners be residents of the city—from no particular neighborhood, district or section—and by common consent and practice during the twenty-six years since the Charter's adoption all elected Commissioners have run at-large, operate impermissibly to dilute the voting power of the city's black electors in violation of the Equal Protection Clause of the Fourteenth Amendment. Black voters as a class are deprived of the opportunity

meaningfully to 'participate in the political processes and to elect legislators of their choice.' *White v. Regester,* supra, 412 U.S. at 766, 93 S.Ct. at 2339."

This statement is no more conclusory than the holdings in *Kirksey* and *Nevett II*: maintenance (that is, failure to take affirmative curative action) of a system now having discriminatory effect, but initially not purposefully racially discriminatory, establishes an existing policy of racial discrimination. Indeed, I am surprised that the majority did not give Judge Ben Dawkins credit for anticipating the holdings in *Kirksey* and *Nevett II.*

The majority remands this case to the district judge for him to make new and more specific findings on the *Zimmer* criteria. I do not understand the majority opinion. The district court faithfully followed *Zimmer.* The remand is unnecessary, wasteful of judge-lawyer-witness time, and demeaning to the district court. This is not to belabor the effect of further delay in judicial recognition of minority voting rights. The district court will now have to hold another hearing. No doubt it can successfully paraphrase earlier findings in words more pleasant to the ear of the majority, but not necessarily more meaningful. Of course, it can only repeat its earlier conclusion.

The experienced district judge cut his eye-teeth on civil rights cases. In many of his earlier voting cases he was reversed when he decided against black complainants. Now he is reversed when he decides in their favor. He must feel that it is impossible to satisfy the Court of Appeals for the Fifth Circuit.

The curious anomaly of the situation is that the district judge did exactly what the majority in *Nevett II* exhorted him to do, before the opinion in that case was written. He wrote a well-reasoned opinion in twelve printed pages. He reviewed in detail all the facts in a record filled with exhibits and the testimony of experts. He made a specific finding on each of the *Zimmer* factors

blacks and whites makes it a foregone conclusion that at-large voting has discriminatory ef-

fects on the access of blacks to the political processes in the City of Shreveport.

and made other findings based on local conditions in Shreveport. He recognized that his "task [was] not to comb the record seeking the presence or absence of any particular fact or set of facts, for none alone is dispositive of the question before us. Instead, our considered opinion 'must represent . . . a blend of history and an intensely local appraisal of the design and impact . . . [a] multi-member district in light of past and present reality, political and otherwise", citing *White v. Regester*, 71 F.R.D. at 634. The court's findings are at least as specific and its conclusions are as free from error as those in *Nevett II* and *Bolden*, two of the three cases consolidated with this case, in each of which the majority affirmed the district court.

The district judge analyzed the voting system in Shreveport. He went into the history of voting in the city. He found that: "[Blacks] have suffered the stigma of segregated schools, separate public accommodations for food and lodging, separate public recreational facilities, segregated seating areas on public conveyances, and separate public restrooms and water fountains. In short, blacks have been subjected to legally imposed cultural deprivations among a white majority, the results of which, as shown infra, have not entirely vanished." *Blacks United, etc. v. City of Shreveport, La.,* 71 F.R.D. 623 at 629. He examined and made findings on the racial and socioeconomic distribution of population and demographic patterns in the city. He considered and made findings on the lack of openness of the political process; the unresponsiveness of city government to the needs of blacks in school facilities, in appointments to local offices, boards and committees, in government services and facilities, in transportation, in housing, and city streets in black neighborhoods. He found "enhancing factors": "The majority primary law, 'place' requirements, absence of residency requirements and racially polarized voting all have exacerbated the past almost total foreclosure of blacks from truly effective exercise of the ballot." *Blacks United, etc. v. City of Shreveport, La.,* 71 F.R.D. 623 at 636. The findings should be

sufficient to satisfy any court as to their specificity and to their adequacy to uphold the district court decision in this case as not clearly erroneous.

As for me, I would take judicial notice that a system of at-large voting for multi-member officials is racially discriminatory—in a community having a heavy majority of white voters, a history of steel-hard, inflexible segregation, and a record (supported by a district court finding) of bloc voting. If, on top of this, a racially discriminatory purpose must be proved (inferred from non-action), I would hold that failure to take affirmative curative action constitutes a present, continuing racially discriminatory purpose under *Nevett II* and *Kirksey.*