*Lita MANYGOATS*
Petitioner-Appellee
*vs.*
*CAMERON TRADING POST*
Respondent-Appellant

In the Supreme Court of the Navajo Nation

No. SC-CV-50-98

January 14, 2000

William J. Darling, Esq., Albuquerque, New Mexico, for Appellant.

Claire Dickson, Esq., Farmington, New Mexico, for Appellee.

Before YAZZIE, Chief Justice, and AUSTIN and M. BEGAY, Associate Justices.

Opinion delivered by YAZZIE, Chief Justice.

This appeal is from a final order of the Navajo Nation Labor Commission ("Commission"), which found that Atkinson Trading Company ("Atkinson'), doing business as the Cameron Trading Post ("Trading Post"), discharged Lita Manygoats ("Manygoats") from her employment as a seasonal clerk and cashier in violation of the Navajo Preference in Employment Act ("NPEA"). Atkinson has three claims: First, that the Commission misapplied the NPEA by finding that the Trading Post did not have just cause for the termination, misapplied the statutory requirement relating to giving written notice of the termination, incorrectly awarded attorney fees and costs, and incorrectly awarded a civil penalty. Second, that the Act violates equal protection and due process of law in regulating the activities of non-Indian employers. Third, that the Navajo Nation does not have civil adjudicatory jurisdiction over a non-member (of the Navajo Nation) employer which conducts business on fee land within the Navajo Nation. The Court will restate the issues and address them in this order: First, does the Navajo Nation have civil regulatory and adjudicatory jurisdiction over the employment practices of a New Mexico corporation conducting business on fee

land within the territory of the Navajo Nation. Second, does the allocation of and burden of proof to show just cause for an employment action in the NPEA violate principles of equal protection and due process of law. Third, did the commission correctly determine and award a civil penalty and attorney's fees in this case.

I

Atkinson is a New Mexico corporation which does business at Cameron, Navajo Nation (Arizona) under the name of Cameron Trading Post. The business is located upon fee land within the exterior boundaries of the Navajo Nation, and to the extent that the corporate owner is controlled by non-Indian individuals, the land is owned by a corporate "non-Indian." Atkinson's principal place of business is in Gallup, New Mexico.

Today's Cameron Trading Post consists of a hotel, convenience store, gift shop, restaurant, gas station, and related facilities. It sells Navajo jewelry, rugs and other arts and crafts, and its customers are both Navajos and non-Navajos. The members of the management of the Trading Post have extensive experience doing business on or near the Navajo Nation and they are aware of the requirements of the NPEA. The Trading Post lies within the Cameron Chapter of the Navajo Nation and has Navajo employees who participate in Navajo Nation government. The predominant population of the Cameron area is Navajo, with an Indian population of 1,011 and a non-Indian population of 24, as of 1990. The Trading Post is the area's major employer, and during the period from April through September, it employs approximately 130 people, 85% of whom are Navajo. The Trading Post employs approximately 80 people during the winter, and 70 to 75% of those employees are Navajos.

Manygoats is a member of the Navajo Nation. She was hired as a seasonal clerk and cashier at the Trading Post on March 7, 1995. She was fired on August 10, 1995 because of two incidents. The first occurred on August 7, 1995, when she gave some Navajo customers incorrect prices, said, "They must be stupid" in front of some Navajo customers, got into an argument with a sales clerk, and refused to leave the sales floor to discuss the matter with the manager. Commission Finding No. 33 (A) -(E). The second occurred on August 9, 1995, when she was absent from work and gave an excuse for her absence which was not accurate. She did not return to work that day, as promised. Commission Finding No. 35(A)-(F). On August 10, 1995, Manygoats learned that her work shift had been crossed out, and when she met with the manager, she found that she had been terminated. The manager gave Manygoats no specific reasons for the termination. When she insisted upon a written notification, the manager wrote, "Lita George [Manygoats] was terminated on 8-10-95 for violation of company policies." Commission Finding No. 36(A)-(E).

Manygoats filed a complaint with the Office of Navajo Labor Relations ("ONLR") on August 11, 1995, alleging that the Trading Post violated 15 N.N.C. §§ 604(B) (8) (1995) and 604(B)(9) (1995), because it did not have just cause to

discharge her, improper notice was given to her, and the workplace was not free of prejudice, harassment, and intimidation, as required by the NPEA. The ONLR gave the Trading Post notice of the complaint on August 14, 1995, and on August 21, 1995, the Trading Post sent Manygoats a letter which listed six reasons for the termination.

When the case went before the Commission, it found that the Trading Post did not have just cause for the termination and that the notice of it to her was inadequate. The Commission ruled in the Trading Post's favor on the freedom from harassment claim. The Commission awarded Manygoats $888.15 in back pay and attorney's fees of $9,887.75. The Commission also levied a $500 civil fine on Atkinson for violations of the NPEA.

## II

### A

Atkinson says that the Navajo Nation does not have jurisdiction over it because of its status as a "non-Indian" corporation and the status of the land upon which it does business. Atkinson maintains that it essentially has nothing to do with the Navajo Nation or its people and that its business is an "island of limited jurisdiction" within the Navajo Nation. This is the second time Atkinson has made such claims, and in the case *In the Matter of Atkinson Trading Co.*, 7 Nav. R. 275 (Nav. Sup. Ct. 1997), we rejected similar claims.[1]

One important characteristic with this appeal, as it was with the prior tax case, is that jurisdiction is highly-factual. Jurisdictional decisions in contemporary Indian affairs law are largely based upon facts going to the relationship of non-Indians with Indian nations and their members, and where certain activities took place. One of the keys to this case is the actual nature of Atkinson's business activities. We were disturbed by the lack of a complete factual description of the nature and history of the Cameron Trading Post in both the prior appeal and this appeal, and we will again use judicial notice to fill in the factual void in the Commission's findings of fact.

Rule 5 of the Navajo Rules of Evidence provides that a Navajo Nation court may take judicial notice of adjudicative facts. A court may take judicial notice of such facts whether the notice is requested or not under Rule 5(c), and it may take notice of facts which are not subject to a reasonable dispute when those facts are generally known within the community or capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned under Rule 5(b). The Navajo Rules of Evidence are patterned upon the Federal Rules of Evidence, so we may look to interpretations of the Federal Rules for guidance, while not being bound by such interpretations.

[1] The prior Atkinson case ruled that the Navajo Nation had civil regulatory jurisdiction to impose a hotel occupancy tax upon Atkinson. We reject Manygoats' claim that the prior decision precludes Atkinson from raising its jurisdictional claims in this appeal. The parties and the issues here are different.

In *United States v. Burch*, 169 F.3d 666 at 671-672 (10th Cir. 1999), the court approved the use of judicial notice of government maps to show the boundaries of land in Ignacio, Colorado as being within "Indian country" for purposes of criminal jurisdiction under the Major Crimes Act. *In Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, 71 F.R.D. 623, 631 (W.D.La. 1976), *remanded on other grounds*, 571 F.2d 248 (5th Cir. 1978), the court approved judicial notice of the comparative states of street repair in affluent neighborhoods and black neighborhoods. Similarly, in *Nationalist Movement v. City of Cumming*, 913 F.2d 885, 893, *vacated & rehg en banc granted*, 934 F.2d 1482 (11th Cir. 1991), *aff'd* 112 S.Ct. 2395 (1992), the trial judge had the discretion to take judicial notice of the loud nature of the plaintiffs' rallies and the sometimes violent counter-demonstrations they attracted, based upon media accounts and public records. We hold that judicial notice of the nature of a litigant in jurisdiction cases is proper and that we may take judicial notice of jurisdictional facts for the first time on appeal on our own motion.

The facts we find to be sufficiently accurate and capable of ready determination are those stated by the Trading Post itself and by a writer who was intimately familiar with Cameron's history. A court may take judicial notice of the organization documents of parties. *See Bethel Conservative Mennonite Church v. Commissioner*, 746 F.2d 388, 392 (7th Cir. 1984).

In this particular case, we studied Cameron Trading Post's website at www.camerontradingpost.com (visited on December 6, 1999). Cameron says that it has little interaction with Navajos, but its website belies that contention. Several pages on the site use a traditional Navajo Yeibechei figure as a company logo in conjunction with the come-on, "Visit the Cameron Trading Post On- Line Store."

The "Introducing the Cameron Trading Post" page has photographs of Indian crafts and of individuals who are obviously Navajo. The caption to a photograph of a weaver says, "Experience the culture and learn about the trades of our ancestors!" There are photographs of a Navajo child with goats with the captions, "Always time for a Kodak moment! " and "One more shot! " Another photograph shows a Navajo woman and child seated in front of a Navajo hogan with the caption, "The teacher and the student."

The "Trading Post Gallery" page features photographs of Indian arts and crafts, and makes the comment, "Walking along the walls of the Gallery and among the exhibits, you may experience the spiritual images of long-forgotten battles, dancing kachinas, songs and chants of the ancestors. That which you cannot touch but can only sense. It is the magic of the ages." The "Gift Shop" page shows Indian arts and crafts and makes this statement:

> Still an important part of the trading post, this is where locals come to trade their crafts for supplies and cash. We carry cloth, pots and pans, groceries, hard goods and treats for the children. Our well stocked store is an important asset for both residents and travelers, just as it was in the old days.

The "locals" would be Navajos from the Cameron Chapter of the Navajo Nation and other nearby chapters and communities, and here we have the Trading Post itself say that it trades with Navajos and caters to their business as "an important asset."

The "History" page says that the Trading Post was founded in 1916, and it describes the (contemporary) role of the Indian trader as that of a merchant, interpreter, and "trusted 'go- between.'" It also says that "The Cameron Trading Post ... is one of the last authentic trading posts. It continues to serve as an active trade and cultural center blending modern commerce with traditional Indian trading customs." The self-description continues:

> The Cameron Trading Post still operates in the true tradition of the Old West. Visitors see first hand a way of life that has changed little over the years -locals hauling water, trading for goods, buying feed and visiting with friends from the far corners of the reservation.... An important part of the trading post is still the grocery and dry goods area with its sacks of flour and sugar, kettles, pans and skeins of native wool hanging from the rafters. Navajo weavers still use this wool today in the time-honored art of weaving beautiful textiles.

Joe Atkinson is quoted as saying, "The most important aspects of the trading post have changed very little in the last century. We're still the sounding board for legal, governmental and other very practical matters." He also says, "What makes Cameron special is not only the fine weavings, baskets and bead work -it's the ambiance. Here you're not just told about the people, their traditions and what trading post life is like. You experience it! This gives the works of art meaning and brings them to life."

The "History" page also says that "The trading post is owned today by Atkinson Trading Company, Inc., an employee owned corporation." The president is Joe Atkinson, the "grand-nephew of C.D. Richardson." C.D. Richardson was also the uncle of Gladwell Richardson, who left us vivid accounts of Indian trading within the Navajo Nation and the history of the Richardson trading family. G. RICHARDSON, NAVAJO TRADER (1986). The Richardson family tree is in this book. *Id.* at 22.

The Cameron Trading Post was one of a chain of Navajo trading posts owned and operated by members of the Richardson family, and the Cameron Trading Post we know today was built by Hubert Richardson in 1916. *Id.* at 136. Looking back at a lifetime of trading within and near the Navajo Nation, Gladwell wrote that "Several men who became famous Indian traders teamed the business at his [Hubert's] Little Colorado River [Cameron] trading post." *Id.* at 137. Gladwell Richardson knew the trading post well because he operated it. *Id.* at 135-145 (chapter on the author's experiences at Cameron). The Trading Post is owned and operated by a relative of its founders and earlier operators and by other employees. The Trading Post's website and history show a continuity of operation

as an Indian trading post with close ties to the Navajo People, and it uses Navajos as a "come-on" for the tourist trade. Accordingly, we cannot accept Atkinson's assertion that the Trading Post has little or no connection with the Navajo People or with the Navajo Nation. The intimate connection is obvious.

We took the time to review these materials because they tell us something very important which is missing from the Commission's findings, and something Cameron's witnesses did not relate in their testimony: That the Cameron Trading Post exists because of Navajos and it continues to hold itself out as an authentic Indian trading post to attract customers. It is as Gladwell Richardson said in his book, "Tourists off the highway were over-filled with curiosity in those days, just as they are now -especially about Indians and anyone working stock." *Id.* at 142 (relating the author's experiences at Cameron). Cameron's contemporary proprietors are obviously following the observations of the founders of the trading post, and Navajos are its star attractions.

As it was with the prior hotel occupancy tax case, it is simply incredible that Atkinson, d/b/a Cameron Trading Post, can claim that there is some kind of jurisdictional force field surrounding its operation and that it has no ties with Navajos or the Navajo Nation. Cameron, along with many other Indian trading posts in the Navajo Nation, was founded by the Richardson family to make money from trade with Navajos and tourists who come to see Navajos and buy their crafts, and it continues to do so today.

## B

Based upon a more complete factual statement to examine jurisdiction, we will now address the question of whether the Navajo Nation has civil regulatory and adjudicatory jurisdiction over the employment practices of a New Mexico corporation conducting business on fee land within the territory of the Navajo Nation. However, prior to proceeding to the contemporary Indian affairs law rules on civil jurisdiction over non-Indians, we will first apply the Treaty of 1868 between the United States of America and the Navajo Nation. 15 Stats. 667. We do so because there are three foundations for jurisdiction in Indian law cases. Our jurisdiction comes from (1) the inherent authority of the Navajo Nation as an Indian nation, (2) the Navajo Nation's treaties with the United States of America, and (3) federal statutes which vest jurisdiction in the Navajo Nation. We address the treaty issue first, because a treaty constitutes the United States' recognition of our jurisdiction. We will then address contemporary Indian affairs law principles of jurisdiction over non-Indians.

We recently made a detailed examination of the Navajo Nation Treaty of 1868 in *Means v. District Court*, 7 Nav. R. 382, 389–91 (Nav. Sup. Ct. 1999). While *Means* was a criminal case, the common points here are territorial integrity and control. Article II of the Treaty of 1868 provides that the lands of the Navajo Nation are "set apart for the use and occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be

willing, with the consent of the United States, to admit among them ...." 15 Stats. at 668; *Means*, 7 Nav. R. at 390. While the entry of non-Indians is not specifically mentioned in the "set apart for the use article, federal courts have consistently held that this treaty language is the basis for Navajo Nation civil jurisdiction, including jurisdiction over non-Indians. *Id.* (citations omitted).

When the Trading Post was built in 1916, it was outside the Navajo Reservation. However, Congress redefined the exterior boundaries of the "Navajo Indian Reservation" on June 14, 1934 and included the land where the Trading Post is located, so that it is within those exterior boundaries. 48 Stats. 960. Thus, the Navajo Nation "reservation" for purposes of the Treaty of 1868 includes "all land within the limits of any Indian reservation under the jurisdiction of the United States government, *notwithstanding the issuance of any patent*, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151 (emphasis ours). Despite the fact that the Trading Post's land is held under a fee patent, there is no jurisdictional "hole" that excludes Navajo Nation jurisdiction, as Atkinson contends, and the land is clearly "on" or "within" the Navajo Reservation for purposes of the Treaty of 1868 and Navajo Nation civil jurisdiction. We now proceed to the contemporary test for civil jurisdiction over non-Indians, taken from *Montana v. United States*, 450 U.S. 544 at 565-566 (1981), and applied in *Strate v. A-I Contractors*, 520 U.S. 438, 565-566 (1997): Did the Trading Post enter into consensual relationships with the Navajo Nation or its members, through commercial dealing, contracts, leases, or other arrangements, or does the Trading Post's activities affect the Navajo Nation's political integrity, economic security, health, or welfare?

In the case of *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311 (9th Cir. 1990), *cert. denied*, 499 U.S. 943 (1991), the court upheld Indian nation jurisdiction over a business because of a variety of consensual commercial relationships, including mining leases and contracts, recognition of the Tribe's taxing power, royalty agreements, employment of members, and the location of a business facility within reservation boundaries. The same principles apply here.

As indicated, depending upon the season, 70 to 80% of the Trading Post's employees are Navajos. The "consensual relationship" with Navajos is an employer-employee one, and employment is a contract. The Trading Post does business with Navajos, another form of consensual relationship, and despite disclaimers at the Commission hearing about the volume of business, it is clear that the Trading Post does have such consensual relationships. As noted, the Trading Post uses Navajo Indians as a lure for tourist business, and tourists visit Cameron precisely to see and interact with Navajos and buy their crafts. We do not buy Atkinson's assertion that the practice of hiring Navajos is involuntary, given their obvious importance to the very business of the establishment (as reflected in its website pages). The Trading Post is taxed by the Navajo Nation, and the Nation provides services to it in the form of police and fire protection

and other governmental services. *In the Matter of Atkinson Trading Co.*, 7 Nav. R. 275. The Trading Post is a licensed federal trader by virtue of its activities within the Navajo Nation, and it must have that license to do business in the Navajo Nation. 25 C.F.R. Part 141 (1999) (Indian trader regulations for the Navajo Nation). We do not understand how the Trading Post can deny a pattern of consensual relationships with both individual Navajos and the Navajo Nation, given the historical fact that it was established to trade with Navajos, and the contemporary fact that the Trading Post asserts that Indian trading is an essential part of its business.

As we pointed out in *Means*, 7 Nav. R. at 392, the Navajo Nation retains the right and the duty to protect its members, the public at large, and its territory. The Navajo Nation Council recognized that the regulation of employment relations and the protection of workers are essential when it adopted the Navajo Preference in Employment Act. *See*, 15 N.N.C. § 602(A) (6). Those are among the most important government powers generally, and it would be nonsense to assert that such authority is not an essential part of the Navajo Nation's powers. *See*, LITTLEFIELD & KNACK, NATIVE AMERICANS AND WAGE LABOR (1996).

Aside from the treaty and "*Montana* test" considerations, it would be senseless to conclude that the Navajo Nation cannot regulate labor relations at the Trading Post, when it clearly can regulate the employment practices of businesses just a few yards away near the Cameron Chapter House, all of which employ Navajos and are within Navajo Nation territory. We find that the Navajo Nation does have civil regulatory and quasi-judicial adjudicatory jurisdiction over the employment practices of Cameron Trading Post when it conducts business on fee land within the Navajo Reservation.

### III

We now turn to the Trading Post's argument that the Commission's procedures violate equal protection of the law and due process of law. We summarily dismiss the Trading Post's contention that it is denied equal protection of the law because only Navajos can bring claims under the NPEA. We cannot address that claim in this case, because the Trading Post has no standing to assert the rights of its non-Navajo employees. There is no case or controversy on that issue, and there would be one only if a non-Navajo employee attempted to make a claim under the NPEA and it was rejected. However, the Trading Post's due process claims have merit. There are essentially two claims: First, that it violates due process of law to place the burden of proof upon the employer to show just cause for an employment decision. Second, that it violates due process of law to make that burden of proof "clear and convincing evidence." 15 N.N.C § 611(B).

There is no due process violation in the allocation of proof. Otherwise, the burden of proof would be upon the employee to show a lack of just cause, and it is more logical to put the burden upon the party taking the employment action. The North Carolina Supreme Court recently rejected a similar claim

in discrimination cases, and we will do the same. *Peace v. Employment Security Commission*, 349 N.C. 315, 507 S.E.2d 272 (1998). The allocation of proof to employers under the NPEA is not unfair nor does it offend principles of justice that are fundamental to the Navajo People. *See, Speiser v. Randall*, 357 U.S. 513 (1958).

We are, however, concerned with the burden of proof under section 611(B). Clear and convincing evidence is usually required in cases involving personal freedom or where strict proof has been required in the common law, including fraud, undue influence, lost documents, reformation of instruments, and like matters. *See*, 9 WIGMORE, EVIDENCE § 2498 (Chad Bourn Rev. 1981).

The United States Supreme Court has found that due process requires a heightened "clear and convincing" standard in various situations involving personal liberty and family relations, *e.g.*, *Schneiderman v. United States*, 320 U.S. 118 (1943) (denaturalization); *Chaunt v. United States*, 364 U.S. 350 (1960) (denaturalization); *Woodby v. INS*, 385 U.S. 276 (1966) (deportation); *In re Winsip*, 397 U.S. 358 (1970) (juvenile delinquency); *Addington v. Texas*, 441 U.S. 418 (1979) (involuntary mental commitment); *Santosky v. Kramer*, 455 U.S. 745 (1982) (termination of parental rights); *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990) (removing life support system). Those cases involve situations where individuals have claimed that the quantum of proof was too little or too low. Here, Atkinson claims that clear and convincing evidence is too much and unfair. *See, Cruzan*, 497 U. S. 261 (challenge to clear and convincing evidence standard for the withdrawal of life- sustaining treatment). Whether or not a given practice violates procedural due process of law depends upon how official action affects private interests, the risk of an erroneous deprivation of an interest using the procedure, and the government's interest in the procedure. *Mathews v. Eldridge*, 424 U. S. 319, 335 (1976).

The affect of official action upon the interests of employers is obvious. It is common knowledge in business and legal communities that there is a great deal of employment litigation and that such litigation is expensive. The prevailing evidentiary standard for employment litigation in the United States, judicial or administrative, is the civil "preponderance" of the evidence, where the factual question is whether it is "more likely than not" that an element of the cause of action or statute has been violated. Our statute calls for a higher standard.

The key to this case is the question of whether the use of the clear and convincing evidence creates a risk of the erroneous deprivation of the Trading Post's legitimate interest in terminating a contract of employment for just cause. We find that it does. While the rights of employees are very important, and the Navajo Nation Council found that the NPEA was needed to protect "the health, safety, and welfare of Navajo workers," 15 N.N.C. § 602(A)(6), we are not dealing with an issue of personal freedom, family integrity, or problems requiring a heightened standard of proof. While labor disputes are important, they are not

"particularly important" and "more substantial than mere loss of money" so as to require clear and convincing evidence to afford due process of law. *Cruzan*, 497 U.S. at 282. We find nothing to justify the use of the clear and convincing evidence standard in civil employment litigation, and instead find that the standard creates a very real danger of the erroneous deprivation of the employer's right to terminate the employment relation for just cause.

We are also mindful of the fact that the evidentiary standard is applied by an administrative quasi-judicial body where legal training in the law of evidence is not required. The civil "more likely than not" standard is easier for the Commission to use. It is also easier to apply on appeal, rather than having to hear appeals over whether the employer offered the correct quantum of evidence at the Commission hearing. Lawyers often use the popular phrase, "a level playing field" to describe fair procedure, and we find that the playing field should be level in employment cases.

We see nothing to support the Navajo Nation's interest in the clear and convincing evidence standard. Certainly, the Nation has an interest in fair employment practices, and it is one which we find to be essential to Navajo Nation government. However, there is nothing in the NPEA which tells us what governmental interest is promoted by clear and convincing evidence. On the contrary, we have heard numerous public statements and policy declarations by the Navajo Nation Council and the Navajo Nation President calling for economic development, and that means that we are guided by concrete statements that employers should be attracted to the Navajo Nation. In the absence of any evidence supporting the governmental interest in the standard, and in light of policy statements which urge the Navajo Nation to do more about employment, we find that there is no governmental interest in support of the use of clear and convincing evidence. The standard at 15 N.N.C. § 611(B) violates due process of law under the Navajo Nation Bill of Rights, 1 N.N.C. § 3, so it cannot survive.

### IV

We finally turn to the issues of the civil penalty of $500 levied upon the Trading Post and the amount of attorney's fees awarded. The first issue is resolved by the fundamental rule that the government cannot penalize anyone without prior notice and an opportunity to prepare a defense against levying the penalty. In this case, the Trading Post had no notice that the Commission would consider a civil penalty, and thus the Trading Post had no opportunity to prepare to defend on that issue. The civil penalty statute at 15 N.N.C. § 612(A) (1) permits a civil fine if the employer intentionally violated the NPEA. While the Trading Post may well have intentionally violated the provision regarding written notice to Manygoats, the Commission complaint had to give the Trading Post notice that there was allegedly an intentional violation and a possible civil fine so that it could prepare for hearing on that issue.

We will not address the issue of what "substantially justified" means for the award of attorney's fees in this case under 15 N.N.C. § 612(A)(1). The Commission erred when it used regional attorney fee hourly rates rather than Navajo Nation rates. The Navajo Nation Bar Association is separate and distinct from the other bars in this region. We have our own admission standards to practice law, our own standards to regulate the practice of law, and our legal economy is separate and distinct. The proper frame of reference to calculate attorney's fees is the hourly rates in the given area where the dispute arose, which here is the Tuba City judicial district. The proper standard is the fee rates of lawyers who practice there.

Accordingly, we affirm the Commission's rulings on jurisdiction, allocation of proof, and freedom from harassment claim. We reverse the Commission's order on the clear and convincing standard of proof, $888.15 award, fine of $500 and award of attorney's fees. This case is remanded to the Commission for further proceedings which are consistent with this opinion.